# CROOK v. INTERNATIONAL TRUST COMPANY OF MARYLAND.

## CROOK v. SAME.

CORPORATIONS; SUBSCRIPTIONS TO CAPITAL STOCK; ASSIGNMENTS; ESTOPPEL; MISREPRESENTATIONS; PRINCIPAL AND AGENT; CORPORATE OFFICERS; WITNESSES; PREJUDICIAL ERROR.

1. A written subscription to the capital stock of a corporation is assignable by the corporation, so as to give the assignee the right to sue in his own name the subscriber, under sec. 433, D. C. Code (31 Stat. at L. 1256, chap. 854), providing that all non-negotiable written instruments for the payment of money, and all open accounts, debts, and demands of a liquidated character may be assigned in writing so as to vest in the assignee a right to sue for the same in his own name.

2. By becoming a stockholder in a corporation, one subjects himself to liability for all corporate action taken in regular course, even though he is not present when such action is taken.

3. Where a subscriber to the capital stock of a corporation, which, under the subscription agreement, is payable in instalments on call of the corporation, is present by proxy at a corporate meeting at which it is voted to make the call upon the subscribers, and at which there is a general agreement to consider the call as made, he has actual notice of the call, and will be deemed to have waived formal notice of the call by the proper officers of the corporation.

4. One may be bound by the misrepresentation of his agent if it is made in the exercise of the agent's apparent authority, and relates to the matter intrusted to his management and control, and the party dealt with has no knowledge of the misrepresentation.

5. Where a trust company having agreed to make a loan to a corporation on the security of 90 per cent of its stock subscriptions, under the belief that 10 per cent of the subscriptions had been paid in, discovered, after paying over part of the loan to the corporation that the 10 per cent had not been paid in, and then refused to pay over the balance of the loan until that was done, and officers of the corporation

afterwards induced the trust company to pay over the balance of the loan upon the representation that a call had been made for the 10 per cent, and that it had been actually paid in,—one of the subscribers is estopped to deny that the call was actually made, where the subscription agreement provided that money might be borrowed by the corporation upon the subscriptions.

6. A stockholder is ordinarily bound by the action taken at a corporate meeting at which he is represented by proxy, whether it be extraordinary or not, unless it is forbidden by the charter or some general law; and if in fact no action was taken, but a false statement is made that such action was taken at the meeting, and a third party is misled thereby, the parties making the same, in person or by proxy, will be estopped to deny that such action was taken.

7. Officers of a corporation are its representatives, charged with dealing with others; and persons dealing with them have the right to assume the validity of their acts in respect of a matter within their power and authority.

8. The fact that a witness is interested in the result of the suit is one that may always be brought out on cross-examination.

9. Where no possible injury could have been done an appellant by the erroneous exclusion of evidence by the trial court, the judgment will not be reversed on that ground.

Nos. 1928, 1929.  Submitted December 7, 1908.  Decided February 2, 1909.

HEARING on appeals from two judgments of the Supreme Court of the District of Columbia, on verdict, the causes having been consolidated for trial, in actions on a stock subscription agreement.                                        *Affirmed.*

The COURT in the opinion stated the facts as follows:

These were actions begun by the International Trust Company of Maryland to recover instalments accruing due at different periods, upon a subscription made by Harrison Crook to the preferred capital stock of the National Vaccine & Formaldehyde Company, a corporation organized under the laws of Virginia.

The testimony set out in the bill of exceptions shows that a certificate of incorporation of the National Vaccine & Formaldehyde Company was regularly issued to the subscribers thereto,

R. K. Helphenstine, James F. Peyton, and O. B. Blackburn, on September, 24, 1906, after approval of the judge of the corporation court of the city of Alexandria, Virginia, in pursuance of authority conferred by the laws of that State. The authorized capital stock was $500,000, divided into shares of $10 each, of which $60,000 were to be preferred, the remainder common stock. The officers designated for the first year were R. K. Helphenstine, President, and James F. Peyton, Secretary and Treasurer. Three others were also designated as directors, namely, Walsh, Baker, and Blackburn.

The incorporators set about procuring subscriptions to the capital stock, and entered into the following agreement with subscribers, among whom was defendant Crook, who signed for 600 shares of preferred stock and the accompanying bonus of 600 shares of common stock:

"This agreement, made and entered into this 5th day of Oct., nineteen hundred and six, by and between the National Vaccine & Formaldehyde Company, a corporation organized under the laws of the State of Virginia, party of the first part, and the subscribers hereto, parties of the second part.

"Witnesseth: Whereas the said party of the first part has a capitalization of Five Hundred Thousand ($500,000) Dollars, represented by Sixty Thousand ($60,000) preferred 6 per cent stock, and Four Hundred and Forty Thousand ($440,000) Dollars common stock; and

"Whereas said party of the first part is desirous of disposing of said preferred stock, and offers same for subscription upon the terms and conditions hereinafter cited, all of which are hereby accepted and agreed to by the subscribers, the said parties of the second part; and it is further agreed that should said party of the first part desire to secure a loan upon the said stock and subscriptions, secured by the subscriptions of the subscribers hereto, it, the said party of the first part, shall have such right and authority from the said parties of the second part; and

"Whereas each subscriber shall receive from said party of the first part an amount of common stock equal to the amount of his subscription for preferred stock at par value, being a common stock bonus of one hundred (100) per cent,

"Now therefore, in consideration of the premises and of the sum of One ($1) Dollar, to each of them in hand paid by the said party of the first part, the subscribers severally, and not jointly, hereby subscribe each to the number of shares of the preferred stock, heretofore recited, set opposite their respective signatures hereto, at and for the price at par Ten ($10) Dollars per share, and agree to pay for the same, in the following manner, it being agreed and understood that no call shall be made upon the subscribers until at least Fifty Thousand ($50,000) Dollars of said preferred stock shall have been subscribed:

"Ten (10%) per cent upon first call;

"Fifteen (15%) per cent, three (3) months after first call;

"Twenty-five (25%) per cent, six (6) months after first call;

"Twenty-five per cent, nine (9) months after first call;

"Twenty-five per cent, twelve (12) months after first call;

"The subscribers hereto further agree that the said party of the first part may assign these subscriptions to any individual, individuals, corporation, or corporations, from whom it may procure said loan, together with said stock as collateral for said loan, and the subscribers further agree that all the rights and privileges herein granted to the said party of the first part by said subscribers shall be assignable to and thereupon may be exercised by such assignee:

"The subscribers further agree that the failure of any subscriber to perform any of his undertakings hereunder shall not affect or release any other subscriber, and that upon such failure the said party of the first part, or its assigns, as aforesaid, shall have the right at its election to terminate the interest of such subscriber in and to said stock as aforesaid, and to hold him liable for, and to recover all damages resulting from such failures, and the said party of the first part, or its assignee may accept a new subscriber or subscribers from time to time in the place of any subscriber or subscribers who shall so fail to perform his or their undertakings hereunder; and the subscribers further agree that each and everyone of them upon reasonable request will, from time to time, execute and deliver and perform all further instruments and agreements necessary and proper

to carry this agreement into effect. It is understood and agreed that nothing contained in this agreement or otherwise shall constitute the subscribers hereto partners with one another, or render them liable to contribute in any event more than their ratable amount as hereto subscribed;

"It is further understood.and agreed that this agreement shall be binding upon the parties hereto, and their respective executors, administrators, survivors, successors, and assigns."

The purpose of the corporation was to purchase the property of the National Vaccine & Antitoxin Establishment located in Prince George county, Maryland, and apparently other like properties. The undertaking was a speculation, and evidently intended to be accomplished by borrowing money, and apparently the parties concerned hoped to profit by it without paying in anything on the capital stock. Crook, himself, testified that when he signed the subscription agreement, "he was assured that he was never expected to pay," and that "he never would have paid his subscription." Negotiations were commenced with the plaintiff for a loan through a Baltimore broker. A loan of $50,000 was effected. This was concluded by executing notes for the same on October 22, 1906. These recited the pledge therewith, as security, of the uncollected balance of the stock subscriptions of the vaccine company to the amount of $54,000 for the $60,000 of preferred stock subscribed for, and $60,000 of common stock. An assignment was executed, by the officers of the corporation to the trust company, of the stock subscriptions, and the agreement of the subscribers, heretofore recited, was delivered to the trust company. The trust company presumed that the first 10 per cent had been paid in, and understood that the assignment covered the remaining 90 per cent. They were told after the papers were executed that this was not the case, and objected, at first, to turning over the money. After some discussion as to the immediate needs of the borrower, the trust company agreed to deliver $22,000, which it did, informing the other parties, at the same time, that it would honor no checks on the remainder until the call had been made and paid. This loan and the execution of the assignment were

authorized by a resolution of the corporation, a copy of which was delivered to the trust company. The next meeting of the incorporators and stockholders was held on October 25, 1906, the recorded minutes of which read as follows:

Alexandria, Va., October 25, 1906.

At a meeting of the incorporators and stockholders of the National Vaccine & Formaldehyde Company, held this day (October 25th, 1906) at the office of C. C. Carlin, 107 N. Fairfax street, Alexandria, Virginia, there were present in person R. K. Helphenstine, President, James F. Peyton, Secretary and Treasurer, O. B. Blackburn, B. E. Taylor, Charles M. Campbell, C. E. Wood, C. C. Carlin, and Louis C. Barley, and the following proxies were presented: L. C. Thorne, William F. Spencer, George E. Howard, F. A. St. Clair, Joseph Schiffman, constituting Ben E. Taylor their true and lawful attorney and proxy to vote their stock for and in their stead and place; John J. Riordan, Jr., Harrison Crook, and Henry M. Baker, constituting R. K. Helphenstine their true and lawful proxy to vote their stock for and in their stead, and this being all the stockholders of the company who are entitled to vote upon motion of Ben E. Taylor, all formal notice of every sort and kind was expressly waived.

The minutes of all former meetings of incorporators, directors, and officers were read, and upon motion of O. B. Blackburn their action in all matters was adopted as the action of the stockholders themselves, and the same was in every way ratified and approved by a unanimous vote of all the stock represented in person and by proxy.

President R. K. Helphenstine stated that it would be necessary under our agreement with the International Trust Company of Maryland for the officers of this company to make the first call of 10 per cent under the subscription contract upon the subscribers, and upon motion of M. B. Blackburn the president and treasurer were directed to immediately make said call and to cover the money into the treasury of the company. After the first call the president and treasurer of the company are

directed to pay all future calls upon the subscription contract, which may be made by the International Trust Company of Maryland, out of any profits or earnings of the company which may have been paid them from any and all sources. The President, Mr. R. K. Helphenstine, informed the meeting that he had assigned the subscription contracts to the International Trust Company of Maryland, together with the preferred and common stock of the subscribers thereto, as collateral security for the payment of the loan of $50,000, and that $20,000 worth of the common stock of the company, fully paid and nonassessable, is to be issued to the International Trust Company of Maryland as a commission for said loan, and $5,000 of the common stock of the company to John J. Riordan, Jr., broker, as a commission for negotiating said loan. Upon motion of M. B. Blackburn this action was ratified, approved, and affirmed, and the president and secretary were directed to issue the common stock of the company in accordance with the aforesaid understanding.

The notes of the company aggregating the sum of $50,000 were executed by the president and secretary, payable to the International Trust Company of Maryland as follows:

(Here insert description of notes).

Upon motion of Ben E. Taylor the president and treasurer were authorized to draw the checks of the company for all expenses which have been incurred in the organization of the company.

Upon motion of O. B. Blackburn, Messrs. C. M. Campbell and C. E. Wood were appointed a committee to see to the execution of the deed from the National Vaccine & Antitoxin Establishment to this company.

The meeting thereupon adjourned until Saturday afternoon, October 27th, 1906, at 2 P. M., at the office of C. C. Carlin, Alexandria, Virginia.

           (Signed)     R. K. Helphenstine, President.
           (Signed)     James F. Peyton, Secretary.

A written proxy executed by Crook on October 23, 1907,

was read in evidence, the execution having been proved. This constituted Helphenstine his proxy to represent him and vote his stock at all meetings of the stockholders of the corporation, "as though I was present and until revoked by me."

Testimony of several witnesses tended to show that the minutes of the meeting aforesaid were correct; that when the meeting was held, the president stated that the demand of the trust company that the first payment should be called and made.

Pursuant to adjournment another meeting was held on October 27, the minutes of which recite:

Alexandria, Va., October 27, 1906.

Pursuant to adjournment, the stockholders, officers, and incorporators of the National Vaccine & Formaldehyde Company met this date at the office of C. C. Carlin, in the city of Alexandria, Virginia, all of the stock being represented in person or by proxy. There were present in person, R. K. Helphenstine, President; James F. Peyton, Secretary and Treasurer; O. B. Blakburn, Ben E. Taylor, Charles M. Campbell, C. E. Wood, C. C. Carlin and Louis C. Barley; and the following proxies were presented: L. C. Thorn, William F. Spencer, George E. Howard, F. A. St. Clair, and Joseph Shipman, constituting Ben E. Taylor their true and lawful attorney and proxy to vote their stock for and in their stead and place; John J. Riordan, Jr., Harrison Crook, and Henry M. Baker, constituting R. K. Helphenstine their true and lawful attorney to vote their stock for and in their stead and place; and, these being all the stockholders of the company who are authorized to vote, upon motion of Ben E. Taylor all formal notice of any sort and kind was expressly waived.

The minutes of the previous meetings were read, ratified, and approved, and the following resolution was offered by O. B. Blackburn, and unanimously adopted:

"Resolved; that the president of this company be and is hereby authorized, empowered, and directed to execute by and on behalf of the company the following agreement, it being expressly understood that only the company's assets shall be bound

thereby, and that no personal liability whatever is created or shall attach to the individual stockholders thereby:   *   *   *"

This agreement was with Campbell and Wood, reciting their subscriptions to 1,650 shares each. It recited, among other things, the desire to pledge the stock subscriptions for a loan from plaintiff; that the corporation agrees to pay to each subscriber 10 per cent of the gross proceeds of said loan, as well as to deliver them the common stock provided in the agreement of subscription; that if said subscribers shall be called upon, under the terms of their subscriptions, to pay any sum whatever on account of said loan, or shall be subjected to any expense, including litigation and counsel fees, the corporation shall reimburse them; further, that the corporation will completely save harmless and indemnify all subscribers on the account aforesaid; that the corporation will execute a mortgage on the property purchased of the National Vaccine & Antitoxin Establishment to secure the performance of this agreement. Other provisions are of no consequence.

The mortgage referred to was then executed and spread upon the minutes. The minutes further recite the election of new officers as follows: Charles M. Campbell, president; Walsh, vice president; Helphenstine, secretary and treasurer; Taylor, manager of sales department. Some other directors were elected, and a committee appointed to prepare by-laws. An appropriation of $350 was made to pay for legal services rendered.

One share of common stock was ordered to be issued to Hough, 400 shares to Baker, and 100 shares to Harrison Crook, "for services rendered, said shares to be fully paid up and nonassessable." It also recited the agreement of the Kuhn Formaldehyde Generator Company to accept $15,000 for its property, and the president, secretary and treasurer were empowered to conclude the purchase. The following letter was authorized to be written and mailed to the trust company:

October 27, 1906.

International Trust Company,
      Baltimore, Md.

Gentlemen:—We herewith inclose you 2,000 shares of the

stock of this company, as per agreement, with the information that our board has called for the first payment of the subscription to the stock. We have drawn one check for the sum of $350, made payable to C. C. Carlin, which you will please honor. In future you will only honor checks when signed by C. M. Campbell, president, and R. K. Helphenstine, treasurer, the company having made this change in its officers today. We enclose copy of resolution of the stockholders and officers of the company, which will be your authority for honoring their checks.

This letter, signed by the corporation acting through Helphenstine, president, and Peyton, secretary, and also signed by Campbell, was mailed to the plaintiff.

The testimony of several witnesses who were present, including Campbell, tended to show that all understood at the meeting of the 27th that the 10 per cent call had been made, and the letter to plaintiff was sent in accordance with that understanding. Helphenstine, who represented himself and Crook, in cross-examination said that he presided at the meeting, and the vote on the letter was by yeas and nays. He is recorded as saying: "This occurred after the letter had been written, very near the close of the meeting; the letter was prepared just about the close of the meeting, and was dictated by Mr. Carlin to Mr. Peyton, and read over, and witness refused to sign it until they agreed to make the call then and there on that date; no call was made; that was to follow; the call was not made then; he testified himself that a call was not made then, but would be made. A call was not made on that date in the sense of sending out letters to different members." On redirect examination he said: "At the meeting on October 27 it was understood among those present that there was no necessity of sending out any notice at all; that they agreed it would be attended to at once."

Other testimony tended to show that a vote was taken to send the letter, and that Helphenstine and Taylor voted proxies in favor of it. One witness said: "Everybody there understood that the call was to be made; Mr. Campbell was to make it." Campbell was elected president at that meeting. Another

said: "All those present understood that a call had been ordered and had been made." It seems that the parties did not contemplate that the money called should actually be paid by the parties, but the plaintiff was not so advised. On receipt of the letter, the plaintiff demanded by telephone that the money called should be collected at once. Most of the members assembled at Alexandria on October 30 to meet this condition. Crook was not represented thereat. The meeting apparently kept no minutes. The parties arranged to borrow the necessary $6,000 called for, from an Alexandrian bank, for a few days, and a personal note was given to the bank by several of them, with the understanding that the note would be met by the money procured from the plaintiff. Without informing the plaintiff of this arrangement a telegram was sent to it saying that the 10 per cent had been collected by the corporation. The plaintiff thereafter paid over the remainder of the loan.

There was testimony tending to show that the plaintiff notified the subscribers whose contracts it held, when the next instalments matured thereunder. Also, that it settled with Barley and Carlin, whose 90 per cent amounted to $900 each, for $800 each. That an agreement had been made with Campbell to pay $2,500 in cash and the remainder of the sum due by him, as per contract, of $14,500, in monthly instalments of $500. That some other small collections had been made. That crediting all payments to date, there still remained due the plaintiff $29,955.16, with interest.

Defendant, on his own behalf, testified that he did not remember signing the proxy; that when he signed the subscription agreement there was one sheet of paper containing the names of subscribers and numbers of shares, and that there were no typewritten pages annexed to it at the time; that he thought he was signing an ordinary subscription contract, and not such a contract as appears in evidence. He also said that he was assured that he was never expected to be called upon to pay, and that he never would have paid the subscription.

Ben E. Taylor, the former sales manager, testified that he attended the meeting of October 27, 1906, and had no recol-

lection of the letter being authorized to be sent the trust company; that he never voted to send such letter, or to make any representations to the trust company, and that he did not hear of a letter or telegram to the trust company informing it that a call had been paid in by the stockholders. That there was never a first call of the 10 per cent "to his knowledge, and he had never heard about making it."

The witness Charles M. Campbell, having been previously introduced by the plaintiff, was recalled by defendant for further cross-examination. He was shown a copy of the agreement between him and plaintiff relating to a settlement of his liability, which he identified. (This instrument recited the suits against Campbell, and his confession of liability to the extent of $14,500 on his stock subscription, which he promised to pay in certain instalments. The eighth and ninth clauses of this agreement provided that the plaintiff should proceed to realize as much as practicable from the assets of the corporation and its unpaid subscriptions, and in the event of such collections, together with that from Campbell, amounting to more than the entire sum due the trust company, with all interest thereon, then there was to be a corresponding abatement of the future payments promised by Campbell.)

Other testimony relating to this agreement will appear in the discussion of the exceptions to the exclusion of evidence.

The two actions against Crook, upon separate instalments due under the agreement, were consolidated for trial with each other and with like actions against two other subscribers, Howard and Baker. The defendant, Crook, moved that a verdict be directed for him. When this was denied, he requested certain special instructions as follows:

"1. The jury are instructed, as a matter of law, that if they find from the evidence that at the meetings on the 25th and 27th of October, 1906, there was not a call or assessment made on the defendant, Harrison Crook, for the payment of the first 10 per cent of his alleged subscription to the capital stock by the National Vaccine & Formaldehyde Company, then the said defendant is not liable for, or bound by, any acts

of the person holding his alleged proxy at said meetings, if they find that there was a proxy, which constituted or amounted to a misrepresentation to be made to the plaintiff, the International Trust Company, that a first call had actually been made or paid; that a power to misrepresent is not created by the giving of a proxy; and their verdict, if they so find, should be for the said defendant, Harrison Crook, on all the counts in the declarations of the two cases of International Trust Company v. Crook, now before them.

"2. The jury are instructed, as a matter of law, that in order to hold the defendant, Harrison Crook, on the subscription contracts offered in evidence, they must find from all the evidence that a call or assessment had been made on the said defendant, Harrison Crook, by the National Vaccine & Formaldehyde Company, prior to or on the 22d day of October, 1906, for the payment of the first 10 per cent of the amount of stock subscribed for by him.

"3. The jury are instructed, as a matter of law, that proxies when given are given for the purpose of conferring upon the holders thereof the power to vote at meetings of the company on all ordinary matters that come before the meetings; therefore, in the cases against the defendant, Harrison Crook, if they find that the alleged proxy was not voted by the witness Helphenstine, the holder thereof, at either of the meetings on the 25th and 27th of October, 1903, in favor of a call or assessment on the subscribers of the stock of the National Vaccine & Formaldehyde Company, for the first 10 per cent of the subscription price, and that the said witness holding said alleged proxy was not present and consequently did not take part in the said meeting on October 30, 1906, and if they further find that the only indication, if any, at said meetings on the 25th and 27th of October, 1906, of a first call being made was the mental impression or understanding of the persons present, and that no call or assessment was made by vote of the said alleged proxy of the said defendant, then they are instructed in so far as the said defendant, Crook,

is concerned, there never was a first call or assessment, and their verdict should be for the said defendant on all the counts of the declarations in the two cases of International Trust Company v. Harrison Crook, now before them.

"The jury are instructed, as a matter of law, that in order to find in favor of the plaintiff as against the defendant, Harrison Crook, they must find from the evidence that a proper, legal call or its equivalent had been made by the National Vaccine & Formaldehyde Company for the payment of the first 10 per cent of the amount of the subscription of the said defendant, Crook."

The foregoing were refused, with exceptions noted. The following special instruction asked by defendant was then given:

"The jury are instructed, as a matter of law, that if they find from the evidence that the papers signed by the defendant, Harrison Crook, with the number of shares set opposite his name, did not have attached to them the pages containing the provisions in reference to any right to assign and to secure a loan, as those provisions appear by the contracts of subscription offered in evidence in the cases against him; and if they further find that the said defendant merely subscribed for the stock set opposite his name, on the last pages of the said contracts of subscription offered in evidence, and did not subscribe for said stock, with the provisions in reference to the right to assign and secure a loan, and that the said pages containing said provisions were subsequently fraudulently inserted, contrary to his actual subscription and without his authority or consent; then their verdict should be for said defendant on all the counts of the declarations filed in the two cases of International Trust Company v. Harrison Crook, now before them."

The court then charged the jury at length. The substance of this charge is: The case involves two propositions, first, whether the stock subscription contract sued on is the identical contract signed by the defendant; second, whether the first instalment of 10 per cent was called, or was agreed to be consid-

ered and treated as though formally called. The burden is on the plaintiff to establish both by the preponderance of evidence. If you should find that the contract attached to the paper signed by defendant was a different one from that now attached, the verdict should be for the defendant. To bind the defendant, it must be the identical paper signed by him. (Then followed the special instruction before noted as given at the request of the defendant.) Even though satisfied that the defendant signed the paper writing in evidence, and by his proxy voted for or knew of the letter written to plaintiff on October 27, 1906, unless you believe that the plaintiff relied on the representations in that letter, and unless you believe that it was agreed, with the knowledge and acquiescence of defendant, as represented by proxy, that the first call should be considered as made, the verdict should be for the defendant. If it was understood that defendant should not be called upon to pay, but that the same should be paid by the company, verdict must be for defendant. Under the conditions of the stock subscription, before defendant could be held legally bound to pay, he was entitled to a notice of a call, and his liability would only become fixed after such call.

To hold defendant, you must find that a call or its equivalent had been made by the corporation for the payment of the first 10 per cent. The defendant is not bound by anything done at the said meeting unless present in person or by proxy. Defendant is not liable at all if at the time he signed the contract it was understood that he would not be called upon to pay the same, but that the corporation would attend to it.

What a man may do in person he may do by agent. If the defendant gave the proxy to Helphenstine, the legal effect thereof was to constitute the latter his agent, and he would be bound by the agent's action. In order for a call to be binding, a subscriber must have proper notice thereof, but he may, in person or by proxy, waive the same.

If, therefore, defendant signed the stock subscription contract, and was represented by proxy at the meeting of October 25, 1906, and at such meeting a resolution was passed direct-

ing the officers to make the first call of 10 per cent; and at the meeting of October 27, 1906, he was likewise represented by his proxy, and, with the knowledge and acquiescence of said proxy, the letter to the plaintiff of that date was authorized, then plaintiff is entitled to recover. It is immaterial whether the call was actually made or not, if it was agreed and understood at the meeting of October 27 that the call should be treated as made and the plaintiff notified that it had been made, provided defendant was represented at that meeting by proxy and acquiesced therein; for then he cannot be heard to deny his liability if he knew that the corporation was about to secure the loan, through that representation, and the plaintiff was relying thereon. At suggestion of defendant's counsel, the court added that there was no evidence that defendant was present in person at the meeting of October 30, when the money was obtained from the Alexandria bank to answer the call, and would not be bound by any call then and there made. Defendant excepted to so much of the charge as stated that a direct call and notice thereof were not necessary. The attention of the court was called to the fact that he had left out of consideration the fact that before the letter of October 27 plaintiff had advanced $42,200 of the loan for which the notes had been given in part, and [defendant] excepted to the same. The jury found for the plaintiff in both actions, and the two judgments entered thereon aggregated $5,400, which is 90 per cent of his total subscription.

From each judgment defendant has appealed, and the two have been brought up in one transcript of the record, and heard together.


*Mr. Wilton J. Lambert* and *Mr. Rudolph H. Yeatman* for the appellant.


*Mr. Walter C. Clephane* and *Messrs. Gans & Haman* for the appellee.

Mr. Chief Justice Shepard delivered the opinion of the Court:

1. The first and third assignments of error relate to the refusal of the court to direct a verdict for the defendant, as well as to give the second and third special instructions. Under these the contention is that the plaintiff has no right to maintain the action as assignee of the subscription contract, because, on October 22, 1906, when assigned, the first call had not been made.

Without regard to the question of the general right to assign such contracts, whereon no call shall have been made, or of the operation of the special clause of the contract authorizing assignment, we think the right is settled by sec. 433 of the Code [31 Stat. at L. 1256, chap. 854], which reads: "All non-negotiable written agreements for the payment of money, including non-negotiable bills of exchange and promissory notes, or for the delivery of personal property, all open accounts, debts, and demands of a liquidated character, except claims against the United States, or the salaries of public officers, may be assigned in writing, so as to vest in the assignee a right to sue for the same in his own name."

2. The second and fourth assignments of error are founded on exceptions taken to refusal of instructions relating to the binding effect of the representation of defendant by proxy. One of these is to the effect that, if the purpose of the meetings was to make a misrepresentation to the plaintiff, the defendant could not be bound. Another is to the effect that a proxy is given for the purpose of empowering the holder to vote at meetings on ordinary matters; therefore, if the said proxy was not voted by the holder at either meeting on October 25 and 27, in favor of a call of the first 10 per cent of the subscription; and, further, that if the only indication of the first call having been made was the "mental impression or understanding" of the persons present, and that no call was made by vote, there never was a first call, and defendant would be entitled to a verdict.

(1) It was not necessary that in order to bind defendant by a call, if made, his representative must actually have voted therefor. A member in attendance may vote against a proposition, or not at all, at his option, and yet be bound by it if adopted by the votes of others. Absentees, even, are bound by corporate action if within the powers of the meeting, and a quorum be present. If the mere ordering of a call was the only thing requisite to defendant's liability, he would be bound even if absent and unrepresented. By becoming a member of a corporation he subjects himself to liability for all corporate action taken in regular course, without his presence.

Defendant's presence in person or by proxy at the meetings in question is important only in so far as affecting his notice of the call, if made. Under the subscription contract the making of the call is the first and essential step to render the subscriber liable. To complete this liability he must have notice of the call; that is to say, action does not lie against him until notified. But if he is in the meeting voting the call, whether in person or by proxy, and therefore has actual notice, no additional notice would seem to be necessary. A general agreement to consider a call as made may not operate as ordering the same, but it would certainly amount to a waiver of the formal notice by the proper officer.

(2) As regards the power to be bound by the misrepresentation of a fact, we think that the rule is the same as in all other matters of agency. One may be bound by the misrepresentation of his agent, if it is made in the exercise of his apparent authority, relates to the matter intrusted to his management or control, and the party dealt with has no knowledge of the misrepresentation. In this case the subscription contract provided that a call should be made, and it was within the ordinary power of the corporation, as well as its duty, to make it in due season. The written power of representation contemplated his proxy's participation in all corporate meetings, and action upon all matters within the scope and powers of the assembled meeting. Nor does the evidence furnish a foundation for the instruction in respect of the power to make a misrepresenta-

tion. If a call was made, it was a fact to be communicated to the plaintiff. Whether it was or was not the secret intention of the persons ordering it, that its payment by the subscribers, would not be enforced, is immaterial. That they did so intend is apparent from the subsequent simulated payment through the arrangement with the Alexandria bank. The effect of the misrepresentation, if there was one, as to the ordering of the call and as to the payment, will be considered under the exceptions to the charge of the court on that point. The general charge correctly stated the case in relation to representation by proxy.

(3) The necessity of the call was stated at the meeting, as shown by the minutes, of October 25, and the same was ordered. On October 27 those minutes are recorded as read and approved. The letter informing plaintiff that the call had been made was then authorized to be sent, and was signed by the proper persons. Testimony tended to show that all understood that the call was made, and that no notice to subscribers by the president was necessary. Aside from the question of estoppel, it was a matter for the jury to determine whether a call had been made, as a fact, and that issue was submitted to them.

If the special instruction, as worded, means, as it apparently does, that there was never anything more than a "mere mental assent or undertsanding," unexpressed, or not given effect to in some act, it would be a correct statement of the law if there were any evidence on which to base it. The only testimony offered by the defendant was that of the witness, Taylor, one of the parties to and the originator of the corporation scheme, who said that he had no recollection of the letter having been presented or authorized; that he did not vote to make any representation to plaintiff about the call; and that there was never a first call of the 10 per cent "to his knowledge; he never heard about the making of such a call." The witness appears to have been present at the meeting on the 25th also, but gave no evidence relating to what had occurred then. What occurred on the 30th is immaterial. It is not claimed that a call was then made. It was made at the two previous meetings, or not at all. The sim-

ulated payment of the call accomplished on the 30th was for the sole purpose of pretending to answer the demand of the plaintiff that the call, of which it had been notified, should be actually collected by the corporation.

3. The next assignment of error relates to the charge of the court to the effect that whether the call was made or not, if the plaintiff was informed by the letter of the proper officers that it had in fact been made, and, relying thereon, without knowledge of its falsity, had advanced the money upon the security of the subscriptions, the defendant would be estopped to deny that the call had been made. The exception of the defendant was limited to this, that the court left out of consideration the fact that $22,000 of the money had been advanced on the 22d, and hence not on the faith of the representation.

We are of the opinion that, under the circumstances in evidence, the estoppel was not inoperative either in part or as a whole. The testimony tended to show that plaintiff entered into the agreement to take an assignment of 90 per cent of the subscriptions under the natural belief that the 10 per cent had been collected. Before paying over any money, it was informed that this had not been done. Upon the promise that it would be done immediately, plaintiff paid over part of the money, but notified the parties that nothing more would be paid until the call had been made and paid. Upon the receipt of the letter that the call had been made, and the further assurance that it had been collected in full, the remainder of the money was paid. Upon failure to perform the condition, the plaintiff would have the right to rescind the contract for the loan, and to demand the return of its part payment. It was not only prevented from exercising that right, but induced also to complete the payment of the loan, by means of the representation, whether true or false, in whole or in part. The representation was intended to prevent it from attempting the recovery of its money that had been paid, as well as to induce it to pay the remainder under the contract. The plaintiff had the right to rely on the statements of the officers of the corporation, and had no information that would put it upon further inquiry. For these reasons we think that the estoppel applied to the entire transaction.

It remains to consider the effect of this estoppel upon the defendant, who was only represented by proxy in making the representation.

A stockholder is ordinarily bound by the action of a meeting in which he is represented by proxy, whether it be extraordinary or not, provided that it is not forbidden by the charter or some general law. *Scovill* v. *Thayer,* 105 U. S. 143, 153, 26 L. ed. 968, 973; *Dickerman* v. *Northern Trust Co.* 176 U. S. 181, 203, 44 L. ed. 423, 434, 20 Sup. Ct. Rep. 311; *Handley* v. *Stutz,* 139 U. S. 417, 423, 35 L. ed. 227, 232, 11 Sup. Ct. Rep. 530.

If, in fact, no action is taken, but a false statement is made that it has been, and another party is misled thereby to his detriment, the parties making the same, in person or by proxy, may be estopped.

If, in fact, a formal act within the power of the corporation has not been exercised, and, notwithstanding the omission, the proper officers of the corporation represent that it has been, and thereby mislead another into acting on the faith of it, the corporation, and through it the shareholders, are bound. The officers are the representatives of the corporation, charged with dealing with others, and persons dealing with them have the right to assume the validity of their actions, in respect of a matter within their power and authority. *Zabriskie* v. *Cleveland C. & C. R. Co.* 23 How. 381, 399, 400, 16 L. ed. 488, 497, 498; *Merchants' Nat. Bank* v. *State Nat. Bank,* 10 Wall. 604, 644, 19 L. ed. 1008, 1018; *Louisville, N. A. & C. R. Co.* v. *Louisville Trust Co.* 174 U. S. 552, 573, 43 L. ed. 1081, 1091, 19 Sup. Ct. Rep. 817.

4. The remaining questions relate to the exclusion of evidence offered by the defendant, and will be considered together. As we have seen, plaintiff was entitled to recover upon proof of either of two facts: First, if a call had actually been made at either of the meetings of October 25 or 27; and, second, if a call was not in fact made, but was represented to the plaintiff as made, to induce it to part with its money, and it did so on the faith of that representation.

The evidence offered related to the first of these issues. The witnesses relied on by plaintiff to prove that the call was actually rendered consisted of subscribers to the enterprise who attended the meetings. C. M. Campbell, who was elected president at the second meeting, was one of these. He succeeded the first president, Helphenstine, who was then also elected secretary and treasurer. Campbell had subscribed the subscription agreement to the extent of 1,650 shares of preferred stock. On the cross-examination of plaintiff's vice president, it was developed that a number of settlements had been made, or agreed upon, with other subscribers to the stock, some of whom had been sued. These included not only Campbell, but Barley, Carlin, and Helphenstine, also, who had subscribed to 100 shares each. It was proved that Barley and Carlin had each settled with plaintiff for $800. Campbell had agreed to pay $2,500 in cash and $500 per month until the entire claim against him of $14,500 should be discharged. He had paid $1,000 of the first payment, and the regular monthly payments thereafter. The witness produced the agreement for this settlement made with Campbell. Campbell, who had previously been examined and cross-examined at length, was recalled by the defendant for further cross-examination. He was asked if he remembered the eighth clause of the settlement agreement, and said he did not. He was then asked whether the plaintiff had not promised him that it would proceed diligently against every other subscriber, and, in the event of collecting its debt in full, would relieve him of further payments thereafter. Plaintiff objected to his answering, and the court sustained the objection. Defendant then offered the agreement, particularly the eighth and ninth clauses thereof. The agreements with Carlin and Barley were also offered. The offer was, first, to show the discharge of defendant by reason of those settlements; and, second, to show that the three parties were interested witnesses, and thereby affect their credibility.

As the obligations of the parties under the subscription contract were several, and there remained more than $29,000 of plaintiff's debt unpaid, defendant has not contended that the settlements were admissible on the first ground of offer. The

contention is that they were admissible as affecting witness's credibility. Whether admissible as furnishing the best evidence of the fact of interest may be questioned. At least, however, the defendant had the right to cross-examine Campbell as to his interest in plaintiff's recovery, and have him refresh his memory by the aid of the agreement, and, in case of his denial, to contradict him by it. The fact that a witness is interested in the result of a suit is one that may always be brought out on cross-examination. As to Barley and Carlin the situation is different. It was proved that they had settled in full for $800, and were therefore no longer interested either way. At any rate, their interest, whatever it might be, was fully disclosed. If there was but the one issue in the case on which plaintiff could recover, namely, the actual making of the call, the error in excluding proof of Campbell's interest would require reversal of the judgment, for we are not permitted to indulge in speculation as to its probable weight with the jury, slight as it apparently would be in view of all the evidence offered. But the estoppel raised by the representation that the call had been made was ample ground for the recovery. There was no question but that the letter representing the fact of the call had been sent, without regard to the evidence of Campbell. There was no attempt to deny that it was in fact signed and sent. That the plaintiff acted on the faith of it was proved by the plaintiff's vice president and by all the circumstances of the transaction. Campbell did not testify to that fact. No possible injury could, therefore, have been done to the defendant by the refusal to admit the evidence. Under such conditions a judgment ought not to be reversed. *Runkle* v. *Burnham,* 153 U. S. 216, 224, 38 L. ed. 694, 697, 14 Sup. Ct. Rep. 837; *Hinckley* v. *Pittsburgh Bessemer Steel Co.* 121 U. S. 264, 278, 30 L. ed. 967, 971, 7 Sup. Ct. Rep. 875; *Klein* v. *Hoffheimer,* 132 U. S. 367, 374, 33 L. ed. 373, 375, 10 Sup. Ct. Rep. 130.

Finding no reversible error in the record of the trial, the judgments will each be affirmed, with costs.          *Affirmed.*

A writ of error to the Supreme Court of the United States was allowed March 2, 1909.