# CRANE v. POSTAL TELEGRAPH CABLE COMPANY.

---

QUESTION FOR JURY; INDORSEMENT OF CHECKS; IMPLIED AUTHORITY; COURSE OF BUSINESS; NOTICE TO PRINCIPAL; BENEFIT RECEIVED.

1. If reasonable men would differ as to inferences which should be drawn from the testimony on questions involved, and consequently as to the answers which should be given, then the question in dispute should be given to the jury; but otherwise if such men would not disagree as to the answer, then the problem is for the court. (Citing *Thomas R. Riley Lumber Co.* v. *McHarg,* 47 App. D. C. 389.)

2. The doctrine that an agent's authority to indorse checks payable to his principal may be inferred from his habit of doing this long enough to establish a settled course of business is not in conflict with sec. 1325 of the Code (31 Stat. at L. 1399, chap. 854), which provides that where a signature is by "procuration" the principal is bound only in case the agent in so signing acted within the actual limits of his authority; since this is to be construed with sec. 1323, stating that in such a case "the authority of an agent may be established as in other cases of agency."

3. Where one person knowingly permits another without objection to represent him, or puts the other in a situation which indicates to those who deal with him that he holds a certain authority, the

NOTE.—On power of agent to indorse checks, see note in 27 L.R.A. 401.

former is estopped from asserting against those who relied upon the appearance of power thus permitted or given, that the putative agent was not acting within the actual limits of his authority.

4. A principal is charged with knowledge of his agent's conduct, not only by what he knows, but also by what he would have ascertained if he had used ordinary care in looking after the conditions of the business affairs in which the agent was engaged. (Distinguishing *Philip Carey Co. v. Thyson,* 39 App. D. C. 233, 237.)

5. Where an agent obtained money from a bank on checks indorsed by him without authority, and embezzled some of it after he had placed the money in the principal's cash drawer or commingled it with his funds, the principal can be charged with receiving the money only to the extent that he can be shown to have actually received the benefit of it.

No. 3137.    Submitted April 5, 1918.    Decided May 6, 1918.

HEARING on an appeal by the defendants from a judgment of the Supreme Court of the District of Columbia in an action to recover funds embezzled by plaintiff's employee.

*Reversed.*

The COURT in the opinion stated the facts as follows:

The appellants, Augustus Crane, Albion K. Parris, and Eugene E. Thompson, copartners, trading as Crane, Parris, & Company, were defendants, and the appellee, Postal Telegraph Cable Company, plaintiff in the trial court; and we refer to them as such in this opinion. The action was for the recovery of $7,746.46, and there was a directed verdict for the plaintiff in the sum of $5,666.16, upon which judgment was entered.

Arrangements were made by the plaintiff with the defendants to do its banking business in Washington. It gave them from time to time certain specific instructions with respect to the handling of its funds. Its cashiers at various times indorsed checks made payable to it for services rendered, and had them cashed by the defendants, who in turn collected their proceeds from the banks on which they were drawn. Green, one of the plaintiff's cashiers, indorsed and had defendants cash a number of such checks. Plaintiff asserted that he was without authority

to indorse them for that purpose; that the payments made to him by the defendants upon them were not binding on it; and that the defendants must be treated as holding for the use and benefit of the plaintiff the money collected on the checks. There is testimony that the cashier placed the money which he received upon the checks in the cash drawer of the plaintiff, commingled it with the latter's funds, and then used it in plaintiff's business. He admits that during the period when he cashed the checks, he embezzled some $18,000 from the plaintiff. It also appears that as cashier he was accustomed to handle monthly from $50,000 to $75,000.

*Mr. Samuel Maddox* and *Mr. H. Prescott Gatley,* for the appellants, in their brief cited:

5 Am. & Eng. Enc. Law, 101; *Armstrong* v. *Ashley,* 204 U. S. 272; *Atlantic Cotton Mills* v. *Indian Orchard Mills,* 147 Mass. 268; *Andrews* v. *Northwestern Nat. Bank,* 117 N. W. 621; *Aldrich* v. *Chemical Nat. Bank,* 176 U. S. 618; *Blake* v. *Domestic Mfg. Co.* 38 Atl. 241; *Bank of United States* v. *Davis,* 2 Hill, 451; *Black Hills Nat. Bank* v. *Kellogg,* 4 S. D. 312; *Bank of Larkin* v. *National Bank,* 57 Kan. 183; *Benesch* v. *John Hancock Mut. L. Ins. Co.* 34 N. Y. S. R. 16; *Cowie* v. *National Exch. Bank,* 96 Pac. 900; *Conover* v. *Insurance Co.* 1 Comst. (N. Y. App.) 292; *Macon County* v. *Shores,* 97 U. S. 272, 279; *Ditty* v. *Dominion Nat. Bank,* 43 U. S. App. 613, 615; *Empire State Cattle Co.* v. *Railway Co.* 210 U. S. 1; *First Nat. Bank* v. *New Milford,* 36 Conn. 93; *Grafton & K. Mfg. Co.* v. *Redelsheimer,* 28 Wash. 376; *Holly Springs Bank* v. *Pinson,* 58 Miss. 421; *Harrington* v. *United States,* 11 Wall. 356; *Insurance Co.* v. *McCain,* 95 U. S. 84; *Moyer* v. *East Shore Terminal Co.* 25 L.R.A. 48; *Merchants Bank* v. *State Bank,* 10 Wall. 604; *Martin* v. *Webb,* 110 U. S. 714; *Morris* v. *Georgia Loan, &c., Co.* 109 Ga. 12; *Millward Cliff Cracker Co.'s Estate,* 161 Pa. 157; *Pine Beach Co.* v. *Columbian Co.* 106 Va. 815; *People* v. *Bank of North America,* 75 N. Y. 559; *Rathburn* v. *Snow,* 10 L.R.A. 355; *State* v. *Over-*

*ton,* 24 N. J. L. 440; *Standard Steam Specialty Co.* v. *Corn Exch. Bank,* 116 N. E. 386; *Walker* v. *R. R. Co.* 26 S. C. 80.

*Mr. Bynum E. Hinton,* for the appellee, in his brief cited:

Am. & Eng. Enc. Law, 855; *American Surety Co.* v. *Pauly,* 170 U. S. 159; *Bank* v. *Armstrong,* 152 U. S. 346; *Buckley* v. *Second Nat. Bank,* 35 N. J. L. 402; Clark & S. Agency; 10 Cyc. 939, 940; *Exchange Bank* v. *Thrower,* 118 Ga. 433; *First Nat. Bank* v. *New Milford,* 36 Conn. 93, 25 L.R.A. 50; *Martin* v. *Webb,* 110 U. S. 7; 5 Michie's Dig. 1013; *Millward Cliff Cracker Co.'s Estate,* 161 Pa. 157; Morse, Bank & Bkg.; *Norton* v. *Shelby County,* 118 U. S. 425; Parsons, Contr. 86 N. Y. 407; *People* v. *Bank of N. A.* 75 N. Y. 547; *Philip Carey Co.* v. *Tyson,* 39 App. D. C. 237; 2 Pom. Eq. Jur. sec. 675; *Relfe* v. *Rundle,* 103 U. S. 222, 226; *Sinclair & Co.* v. *Goodell,* 93 Ill. App. 594; *Storm* v. *New York Elev. R. Co.* 82 Hun, 11; *Talbot* v. *Bank of Rochester,* 1 Hill, 295.

*Mr. Chief Justice* SMYTH *delivered the opinion of the Court:*

Does the testimony tend to show (a) that the cashier was authorized to indorse the checks for the purpose of receiving the money thereon; and, if not (b) that the money thus received by him went to the benefit of the plaintiff? These are the two questions upon which the determination of the case turns.

If reasonable men would differ as to the inferences which should be drawn from the testimony bearing upon either of those questions, and consequently as to the answer which should be given, then the question with respect to which the dispute would arise should have been given to the jury for its solution. On the other hand, if such men would not disagree as to the answer, then the problem was for the court. *Thomas Riley Lumber Co.* v. *McHarg,* 47 App. D. C. 389, and cases there cited.

Plaintiff in 1908 appointed defendants its bankers in this city. On August 4, 1911, it gave to them this instruction: "Honor checks drawn against the account of this company with your bank when signed in the name of the company by N. I.

Taylor, Cashier, and countersigned by G. M. Foote, Manager."
It is the only instruction given with respect to the payment of
checks. As will be noted, there is noting in it concerning checks
which were not "drawn against the account" of the plaintiff,
such as the checks involved in the litigation. The name of the
cashier was changed from time to time, but otherwise the in-
struction remained the same during the period covered by this
action.

According to the uncontradicted testimony it was among the
duties of the cashier to receive and handle the moneys and
checks which came into the office, and deposit them in the de-
fendants' bank. He had general charge of the bank account
with the defendants. He was accustomed to indorse the checks
with a rubber stamp reading, "Pay to the order of Crane, Par-
ris, & Company, Postal Telegraph-Cable Company, by Henry
Green, Cashier." The indorsement was not limited for the pur-
pose of deposit or collection, but was general.

The local manager of the company testified that he had never
received any instruction from his superiors about the cashier
indorsing checks, and that he did not know of the cashier hav-
ing received any instructions upon the subject, but added that
the only indorsement which the latter was authorized "to put
on a check payable to the company was the rubber stamp" just
referred to.

Green had been employed by the company for about a year
and one half as a counter clerk and manager's clerk before be-
coming cashier, and served in the latter capacity from February,
1913, to and including October, 1914, or more than twenty
months. He testified without substantial contradiction that
during his term as cashier when he needed money to transact
the business of the company, and had in his possession checks
similar to the checks in question, he would indorse them by plac-
ing thereon the rubber stamp described above, take them to the
bank, and cash them; that the local manager knew this; that the
object in cashing such checks "was to get money that was needed
in the course of the day's business." He further said that "it
had been the habit or custom of the company as far as he could
remember to have the customers' checks cashed in that manner

so as to have the money necessary for the business of the company." While he was manager's clerk he was brought into contact with the persons who were then cashiers and they, he said, cashed checks just as he had done.

Taylor, another cashier, who had served for eighteen months before Green, having become cashier in February, 1911, testified that it was his practice to indorse money orders which he had cashed during the day, and get the money upon them from the defendants.

Warren, also a cashier who had been with the company six months commencing in August, 1912, said that it was his practice to indorse customers' checks just as Green had done, and get the money upon them from the defendants; that he did this with the knowledge of the local manager, and that the money which he received was used "generally to pay money orders."

Gilpin, the defendants' cashier, said that he knew the cashiers Green, Warren, and Taylor, also Malloy and Sullivan, who had acted as cashiers for the plaintiff before them; that for upwards of six years he had "been in the habit of cashing for the several cashiers of the plaintiff on their respective indorsements checks which had been drawn by individuals on various banks payable to the plaintiff;" that when he cashed these checks he "was told by the cashiers that they were short of funds * * * to run the office;" that "they brought these checks up to us [him] to cash," and, knowing that the men who presented the checks were officers of the Washington branch of the plaintiff company, he cashed the checks; that he never had any notice whatever that the cashiers of the company had no authority to indorse such checks; that while the plaintiff had notified the defendants as to what the local officials of the company "could do with respect to drawing funds," they received no notice as to who was "to do the banking business with the bank;" and that, relying upon the fact that Green was the duly authorized cashier of the company, he cashed the checks in question.

Assuming this testimony to be true, we have a situation in which the plaintiff appointed a cashier of its local business, with all the power usually belonging to such a position, so

far as defendants knew, except in the particular already noted
with regard to drawing checks against the funds of plaintiff,
and one other which, however, has no bearing on the case;
and where for more than six consecutive years different cashiers
of the plaintiff, including the one whose right to act for the
plaintiff is in question, exercised, to the knowledge of the de-
fendants and with the apparent acquiescence of the plaintiff,
the authority which is now denied. And the problem is as to
whether or not these things would have been sufficient, if sub-
mitted to the jury, to warrant a finding that the defendants,
when they cashed the checks, were justified in believing that
Green—the cashier—had from the plaintiff the power which
he asserted.

The supreme court of Ohio in *Sturges* v. *Bank of Circleville,*
11 Ohio St. 153, 167, 78 Am. Dec. 296, said that "a cashier
is defined to be one who has charge of money, or who super-
intends the books, payments, and receipts of a bank or moneyed
institution." His authority, comparable to that of any other
agent, may be proved in many ways. "It may be inferred
from the general manner in which, for a period sufficiently long
to establish a settled course of business, he has been allowed
without interference, to conduct the affairs" of his employer.
*Martin* v. *Webb,* 110 U. S. 714, 28 L. ed. 49, 52, 3 Sup. Ct.
Rep. 428. In *Fifth Ward Sav. Bank* v. *First Nat. Bank,* 48
N. J. L. 513, 7 Atl. 318, the question was with respect to
the authority of the treasurer of a corporation. He had pledged
securities of his employer for money which he fraudulently
applied to his own use. The employer denied his authority
to make the pledge. There was a verdict for the plaintiff.
In reviewing the question, the court of errors and appeals of
New Jersey said: "When, in the usual course of the business
of a corporation, an officer has been allowed to manage its
affairs, his authority to represent the corporation may be
implied from the manner in which he has been permitted
by the directors to transact its business * * *, in such
cases, the authority of the officer does not depend so much
on his title, or on the theoretical nature of his office, as on the
duties he is in the habit of performing." The court of appeals

of New York in *Olcott* v. *Tioga R. Co.* 27 N. Y. 546, 558, 84 Am. Dec. 298, ruled that "the powers of the agent of a corporation are such as he is allowed, by the directors or managers of the corporation, to exercise within the limits of the charter, and the silent acquiescence of the directors or managers may be as effectual *to clothe the agent with power* as an express letter of attorney." Chief-Baron Pollock in *Smith* v. *M'Guire,* 3 Hurlst. & N. 554, 560, 157 Eng. Reprint, 589, said: "Has the party who is charged with liability under the instrument or contract authorized and permitted the person who has professed to act as his agent to act in such a manner and to such an extent that, from what has occurred publicly, the public in general would have a right to reasonably conclude, and persons dealing with him would naturally draw the inference, that he was a general agent? If so, in my judgment, the principal is bound, although, as between him and the agent, he takes care on every occasion to give special instruction." See also *People* v. *Bank of North America,* 75 N. Y. 547, 559; *Blake* v. *Domestic Mfg. Co.* 64 N. J. Eq. 480, 38 Atl. 241.

This doctrine is not in conflict with sec. 1325 of the Code [31 Stat. at L. 1399, chap. 854], which provides that where a signature is by "procuration" "the principal is bound only in case the agent in so signing acted within the actual limits of his authority;" for Code, sec. 1323, which of course must be construed with sec. 1325, says that in such a case "the authority of an agent may be established as in other cases of agency." Where one person knowingly permits another without objection to represent him, or puts the other in a situation which indicates to those who deal with him that he holds a certain authority, the former is estopped from asserting, against those who relied upon the appearance of power thus permitted or given, that the putative agent was not "acting within the actual limits of his authority."

If it can be correctly said that plaintiff did not have actual knowledge of the practice of its cashiers, there is much testimony which has a strong tendency to show that if it had exercised reasonable diligence in overseeing their conduct it would

have acquired such knowledge. Plaintiff had requested its customers to pay their bills by check, and the local manager says that it was their invariable custom to do so. These checks were not sent to the treasurer of the plaintiff, who had his office in New York, or to any other officer there, to be indorsed, and without indorsement they could not, of course, be cashed. Every month statements were made by the defendants to the treasurer in New York, showing the condition of the plaintiff's account. The checks just mentioned constituted the chief source of the funds deposited with the defendants to the plaintiff's credit. From this the latter must have learned that the checks had been indorsed by somebody other than the treasurer, assuming to have authority for that purpose. Yet it made neither inquiry nor objection.

Auditors representing the plaintiff visited the office of the cashier every three or four months and checked over his accounts. The stamp by which the checks were indorsed was kept in the office at a place where, we may assume, it could have been inspected. If the auditors had looked at it they would have seen that the indorsement which it provided contained no limitation, and, hence, might be used to get cash for the checks as well as for the purpose of depositing them for collection. An inquiry from them at the bank would probably have revealed the cashier's method of doing business. And if it was not their duty to make such inquiry, would it be unreasonable to say that the plaintiff through some other officers or agents should have done so? Was it not, in fairness to those with whom it did business, incumbent on the plaintiff to oversee the work of its cashiers for the purpose of learning what course they were pursuing in the transaction of the business intrusted to them, and whether they were, in dealing with others, keeping within the limit of their actual authority, or whether they were building up a practice in contravention of it? Green said that he saw "how absolutely easy it was to get it [the money];" and the local manager, placed there by the plaintiff as its chief representative, stated that he "became suspicious of Green in June, 1914." This was before any of the money was embezzled.

These things, we think, have a tendency to show what the plaintiff would have discovered if it had inquired; and it is charged not only with what it knew, but also with what it would have ascertained if it had used ordinary care in looking after its business affairs in this city. It is the duty of a corporation "to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers." *Martin* v. *Webb,* 110 U. S. 15, 28 L. ed. 52, 3 Sup. Ct. Rep. 428. In the *Martin Case,* the Supreme Court of the United States, speaking of the duty of bank directors, said: "That which they ought by proper diligence to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business." The New York court of appeals in *Cutting* v. *Marlor,* 78 N. Y. 454, 460, a case referred to with approval by the Supreme Court of the United States in *Preston* v. *Prather,* 137 U. S. 604, 614, 34 L. ed. 788, 792, 11 Sup. Ct. Rep. 162, 1 Am. Neg. Cas. 599, held, apropos to the obligation of managers of a corporation, that "the employment of agents of good character does not discharge their whole duty. It is misconduct not to do this, but in addition they are required to exercise such supervision and vigilance as a discreet person would exercise over his own affairs. The bank might not be liable for a single act of fraud or crime on the part of an officer or agent, while it would be for a continuous course of fraudulent practice, especially those so openly committed and easily detected as these are shown to have been. Here were no supervision, no meetings, no examination, no inquiry."

May it not be said in the present case that there were no supervision, no inquiry? If there had been either with respect to the cashiers, would not the plaintiff have "easily detected" what they were doing? At least may not that inference be drawn from the situation; and, if so, was it not a matter for the consideration of the triers of fact? We believe it was.

Much stress is laid in argument upon a by-law of the plaintiff which provides that "the treasurer of the company shall

also have power, and he hereby is authorized, * * * to indorse checks and warrants in its name and on its behalf, and full discharge for same to give." From this it is argued that the treasurer, and he alone, was authorized to indorse checks. That may be so as between the treasurer and the corporation, but it was not so in the circumstances of this case as between the corporation and third parties to whose attention it had not been brought. No claim is made that the defendants knew of it. The cashier and local manager both say that they had never received any instructions about the "cashier indorsing checks." Where the testimony tends to show, as here, that a corporation either intentionally or through neglect allowed an employee to hold himself out as having power which did not belong to him, it cannot escape responsibility for his conduct by producing a secret resolution limiting his authority. To allow it to do so would not be fair. In *Southern L. Ins. Co.* v. *McCain,* 96 U. S. 84, 86, 24 L. ed. 653, 654, the court said: "No company can be allowed to hold out another as its agent and then disavow responsibility for his acts. * * * The law is equally plain that special instructions limiting the authority of a general agent, whose powers would otherwise be coextensive with the business intrusted to him, must be communicated to the party with whom he deals, or the principal will be bound to the same extent as though such special instructions were not given. Were the law otherwise, the door would be open to the commission of gross frauds. Good faith requires that the principal should be held by the acts of one whom he has publicly clothed with apparent authority to bind him." Other authorities bearing upon the point are, *Rathbun* v. *Snow,* 123 N. Y. 343, 10 L.R.A. 355, 25 N. E. 379; *Graton & K. Mfg. Co.* v. *Redelsheimer,* 28 Wash. 370, 376, 68 Pac. 879.

Of course where the principal does not lend to the employee the appearance of authority, or is not guilty of neglect in allowing him to assume and use a power with which he was not vested, then a third party dealing with the pretended agent is bound by his actual authority, whether expressed in a by-law or otherwise. Such is the case of *Philip Carey Co.* v. *Thyson,*

39 App. D. C. 233, 237, but that is not this case and hence it is not apposite.

Assuming that Green had no right to act for the plaintiff in the receipt of the money from the defendants, and that their payment of it to him did not discharge their obligation to the plaintiff with respect to it, yet if they were able to prove, and the burden would be upon them, that Green had used the money for the benefit of the plaintiff, the latter could not recover. This is so because in such circumstances the plaintiff would suffer no injury from the unauthorized conduct. Judge Taft, speaking for the circuit court of appeals in *Ditty* v. *Dominion Nat. Bank,* 22 C. C. A. 376, 43 U. S. App. 613, 75 Fed. 769, a case where the president of a bank had borrowed money without authority to conceal his prior embezzlements and devoted it to the use of the bank, said, referring to the bank: "Having received the benefit through an agent, it is affected with the burden of the notice which that agent had of its reception, and therefore it became liable for money had and received to its use." To the same effect are Morse, Banks & Bkg. sec. 440b; *Andrews* v. *Northwestern Nat. Bank,* 107 Minn. 196, 25 L.R.A.(N.S.) 996, 117 N. W. 621, 122 N. W. 499; *Bank of Lakin* v. *National Bank,* 57 Kan. 183, 45 Pac. 587.

The cashier Green testified concerning the money which he had received upon the checks, that he "commingled it with the money that was in the cash drawer, and used it to transact the day's business, and paid money orders out of it;" and that subsequently he "deposited to the credit of the plaintiff's account with defendants by way of cash deposits" some of the money thus obtained, but he could not say how much; and that the money which he received upon the checks "was so commingled" with the other money in the cash drawer that "he could not say which he took." There is no contradiction of this testimony. Its weight was for the jury. If they believed that Green had placed the money in the cash drawer of the plaintiff, and that it was used by him in the business of the latter, then it could not recover. But the mere putting of the money in the cash drawer, or the commingling of it with funds

of the plaintiff, would not be sufficient. It would constitute a defense on that score only to the extent to which defendants could show that plaintiff had received the benefit of the money.

The case is reversed at the cost of the appellees, with directions to grant a new trial in accordance with this opinion.

*Reversed and remanded.*