TEL–ADS, INC., Plaintiff,

v.

TRANS–LUX PLAYHOUSE, INC., and Trans-Lux Corp., Defendants-Third Party Plaintiffs,

v.

Edwin ROSENFELD, Third Party Defendant.

Civ. A. No. 68–64.

United States District Court
District of Columbia.

July 20, 1964.

━━━━━━━━━━━━

J. E. Bindeman, Leonard W. Burka, Washington, D. C., for plaintiff.

Joseph A. Fanelli, Washington, D. C., for defendant-third party plaintiff.

Milford F. Schwartz, Washington, D. C., for third party defendant.

YOUNGDAHL, District Judge.

Plaintiff's claim, defendant's counter-claim, and defendant's third party claim against third party defendant came on to be heard before the Court sitting without a jury. Upon consideration of the briefs submitted by all parties both before and after the trial, and the evidence present-ed and arguments made in open court, the Court has reached the following con-clusions, which shall be considered as findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

Plaintiff is a corporation engaged in the business of promoting, publishing, selling and distributing a book under the trade name of "Showtime—d. c." (here-inafter referred to as "Showtime Book"), which contains various coupons which, when presented to the box office of the entertainment facilities listed on such coupon, entitle the holder to one free admission when accompanied by a guest who purchases a ticket of equal value at regular prices.

Defendants are corporations which own and operate two motion picture the-atres in the District of Columbia: the Trans-Lux Playhouse at 727 15th Street, N. W., and the Trans-Lux Theatre at 736 14th Street, N. W. Both defendants are part of a chain of seventeen theatres in-dividually operated by seventeen affiliat-ed companies in Baltimore, Philadelphia, New York City, Boston, Detroit, and Washington, D. C. All of the affiliated companies, including the two defendants, have their home offices in New York City.

Third party defendant, Edwin Rosen-feld, was district manager for the two defendant corporations in the Baltimore-Washington area at all pertinent times.

On November 21, 1963, Rosenfeld sign-ed an "Advertising Agreement" between plaintiff and "Trans-Lux Theatres," by which plaintiff, at its own expense and without charge to Trans-Lux, would print and insert in its Showtime Book six coupons, three for the Trans-Lux Theatre and three for the Trans-Lux Playhouse. Each of these tickets entitled the holder to one free admission "when accompanied by a guest who purchases one [admission] at regular price." It was stated in the agreement that Trans-Lux Theatres authorized these six in-sertions "with the understanding that not more than 5,000 [Showtime Books] will be sold." It was further stated that the theatres agreed to honor all coupons presented, and that plaintiff would pay all advertising, printing and other costs incidental to the sale of the Showtime Book. Each book was to be marked to expire one year from date of sale to the purchaser. In fact, the books which were printed and offered for sale noted on the tickets for defendants' theatres that the offer was "good thru October 31, 1964." Rosenfeld signed the agreement as "Owner, Partner or Authorized Agent." Daniel D. Richard, plaintiff's general manager, signed for plaintiff.

On December 17, 1963, following an extensive advertising campaign in Wash-ington newspapers to promote the Show-time Book,[1] plaintiff received the follow-ing telegram from Thomas E. Rodgers, vice president of each defendant (and of all of the other affiliated theatres), sent from New York City:

"We have just heard that Mr. Ed Rosenfeld, manager of our Washing-ton district, has purportedly entered into an agreement with your firm re-lating to certain premium coupons for our theatres. This is to advise

---

1. Advertisements appeared in "The Wash-ington Post" on November 10, November 17, November 24, and December 8, 1963; and in "The Washington Star" on No-vember 13 and November 17, 1963.

you that Mr. Rosenfeld is not an officer of our corporation and is not authorized to enter into any agreement on our behalf. We herewith demand that you immediately cease distribution of any booklets or other materials containing premium coupons for any of our theatres. We intend to hold you liable for any damages resulting to us from your failure to discontinue distribution of such premium booklets. Will you kindly acknowledge your agreement to discontinue such distribution." (punctuation added.)

On December 19, 1963, plaintiff acknowledged receipt of the telegram, refused to cease distribution of the Showtime Books, and threatened legal action if defendants in any way impaired the continued sale of Showtime Books or refused to honor the Showtime tickets when presented at the box office. The letter contained the following paragraph:

"I note your statement that Mr. Ed Rosenfeld whom you identify as the 'manager of (your) Washington District' and who executed the contract on behalf of Trans-Lux Theatres was not authorized to enter into such agreement. As you yourself point out, Mr. Rosenfeld was your manager. He was in complete charge of the Trans-Lux operations and as far as my client knows, no one in Washington had any higher authority. As such, I believe that Mr. Rosenfeld would be deemed legally to have apparent authority to enter into a contract of this type."

On January 10, 1964, after notice to defendants, plaintiff filed a complaint in this court for injunction, a temporary restraining order, and damages for breach of contract. On the same day, Judge Keech issued a temporary restraining order restraining defendants "from refusing or otherwise failing to honor the coupons contained in said Showtime Books for the Trans-Lux Playhouse Theatre and the Trans-Lux Theatre when presented in accordance with terms stated on said coupon." On January 24, 1964, following a hearing on the motion for a preliminary injunction, Judge Hart issued a preliminary injunction enjoining defendants from refusing to honor the coupons contained in the Showtime Books. In his order, Judge Hart reached the following conclusion of law, *inter alia*:

"The contract entered into between plaintiff and defendants * * *, reduced to writing on November 21, 1963, is valid and binding upon defendants since Edwin Rosenfeld, District Manager of defendants' theatres, who entered into the said contract, had apparent authority to so act."

After certain discovery and pre-trial procedures, the case was advanced on the calendar, and trial before this Court followed.

■ 1. This Court has concluded that Rosenfeld had apparent authority to enter into the agreement with plaintiff.

In July, 1962, Rosenfeld, after gradually gaining responsibility in the Trans-Lux operations since his employment in 1951, was named district manager in charge of the Baltimore-Washington area, which contains six theatres. His duties included supervising the theatres and engaging in advertising, publicity and promotion. He had the authority to issue various types of free passes to the theatre, and undertook various promotional ideas. He had no superior in the Washington-Baltimore area, and reported directly to the New York office.

The first contact between Rosenfeld and Richard, plaintiff's general manager, occurred on September 13, 1963. Richard called Rosenfeld on the telephone and explained the entire Showtime Book program to him. He asked Rosenfeld if Rosenfeld was in charge of the Baltimore and Washington Trans-Lux Theatres, and Rosenfeld replied that he was the manager in charge of both areas. Rosenfeld used the phrase "district manager," which was his correct title. During the course of either this telephone conversa-

tion or a subsequent one, when Richard inquired about getting Trans-Lux theatres in Philadelphia and New York City to participate in the Showtime Book program, Rosenfeld told him that officials in the home office in New York would have to be consulted about Philadelphia and New York. Richard did not ask Rosenfeld whether Rosenfeld had authority to enter into the Showtime Book agreement as to Washington and Baltimore,[2] but he assumed that he had the authority since Rosenfeld made and signed the agreement. Rosenfeld testified that he thought he had the authority to make the agreement; that he was not aware of who had the authority to sign contracts; that he had never seen any written limitations upon his authority; and that he entered into the contract because he thought it would be advantageous to defendants to bring into the theatre people who would not otherwise attend. Rodgers, defendants' vice president, testified that no written instructions had been given to Rosenfeld in regard to the extent of his authority, and that he did not recall if any oral instructions on the subject were given to him.

In the above circumstances, Rosenfeld in fact may have had actual authority to enter into the agreement with plaintiff. He offered credible testimony that he in fact sent a memorandum to the New York office after his initial conversations with Richard explaining the Showtime Book program and saying that he thought it would be good to go ahead with it. He received no answer from New York, and the New York office did not find such a memorandum in its files. Whether or not defendants received this memorandum and whether or not Rosenfeld had such actual authority are not questions which this Court need decide, because it is abundantly clear to the Court that Rosenfeld had apparent authority to enter the agreement on behalf of defendants.

The Court agrees with defendants in their statement of the law governing apparent authority: A third party's binding of a principal by the apparent authority of his agent rests essentially on estoppel. A third party seeking to hold a principal on the apparent authority of the agent must show acts or statements of the principal known to the third party and on which the third party reasonably relied to his detriment. However, no specific, positive and intentional act or representation by a principal concerning his agent's authority is necessary to give the agent apparent authority to perform a specific act. "The apparent authority of an agent to perform an act may also arise by placing him in a position which causes a third person to reasonably believe that the principal had consented to the exercise of authority the agent purports to hold. This falls short of an overt, affirmative representation by a principal." Drazin v. Jack Pry, Inc., 154 A.2d 553, 554 (D.C.Mun.App.1959). "The apparent authority of an agent arises when the principal places the agent in such a position as to mislead third persons into believing that the agent is clothed with authority which in fact he does not possess." Jack Pry, Inc. v. Drazin, 173 A.2d 222, 223 (D.C.Mun. App.1961). "Where one person knowingly permits another without objection to represent him, or puts the other in a situation which indicates to those who deal with him that he holds a certain authority, the former is estopped from asserting, against those who relied upon the appearance of power thus permitted or given, that the putative agent was not 'acting within the actual limits of his authority.'" Crane v. Postal Tel. Cable Co., 48 App.D.C. 54, 61 (1918). A principal is charged with knowledge of his agent's conduct, not only by what he knows, but also by what he would have ascertained if he had used ordinary care in looking after the conditions of the business affairs in which the agent was engaged. Crane, supra at 61–65. "One may be bound by the misrepresentation of his agent, if it is made in the exercise

2. Plaintiff has abandoned its claim concerning an alleged breach as to Trans-Lux Theatres in Baltimore.

of his apparent authority, and relates to the matter intrusted to his management or control, and the party dealt with has no knowledge of the misrepresentation." Crook v. International Trust Co., 32 App. D.C. 490, 507 (1909).

It is clear to this Court that defendants' act of holding Rosenfeld out to the public as its district manager was sufficient to charge defendants with the agreement which Rosenfeld entered. Defendants failed to exercise ordinary care in setting forth to Rosenfeld himself any limitations upon his authority, and therefore defendants created the very aura of authority on which both Rosenfeld and plaintiff reasonably relied. In these circumstances, plaintiff was under no obligation to inquire in more detail about Rosenfeld's authority to enter into this agreement. Such authority was apparent to the reasonable observer, particularly when Rosenfeld referred Richard to the New York office for any agreements as to Philadelphia and New York, but did not do so in regard to the Baltimore-Washington area, of which he was clearly in charge. Finally, the contract was within the general area of Rosenfeld's actual authority, even if his actual authority may not have reached this far, thus making reliance upon purported authority reasonable.

This Court has therefore concluded that defendants breached the contract when they refused to honor the Showtime Book tickets when presented at the box offices of their theatres.

2. Plaintiff claims damages for loss of anticipated profits of approximately $13,000, but has failed to prove by a fair preponderance of the evidence that it is entitled to any such amount.

The Showtime Books were sold to the general public at $15 per book, and to others at various reduced rates. Of 5,000 printed, a total of 1,326 had been sold to the date of trial (424 @ $15 each; 613 @ $12 each; and 289 @ $5, $5.50, and $7.-50). On these, plaintiff made a net profit (considering all of its expenses for the 5,000 books printed) of $699.

[6] Plaintiff claims that it would have sold the entire printing of 5,000 books if defendants had not breached the contract, and that the loss of anticipated profits on the remaining 3,674 books is chargeable to defendants. However, the Court does not agree. In the first place, the Showtime Book was an entirely new venture, and there is no way of knowing how many of the 5,000 books would have been sold if the defendants had not breached. After an extensive advertising campaign, including full-page newspaper advertisements, only 758 books were sold in the month of November, 1963, and plaintiff's advertising in December, 1963, was already tapering off before the telegram of December 17 was received. Second, plaintiff was under a clear duty to mitigate damages by tearing out the Trans-Lux tickets and attempting to promote and sell its remaining books at a reduced rate. In the absence of such mitigation, the Court cannot award substantial damages for loss of anticipated profits. Third, it is doubtful whether plaintiff could have sold many Showtime Books after December in any event, since in the case of a number of the entertainers—including the National Symphony Orchestra, Patrick Hayes Concert Bureau, American Light Opera Company, and Theatre Lobby—at least nine specific events for which coupons could be used had already passed by December 17. Thus by December 17 the Showtime Books had substantially lessened in value to the prospective purchaser by the mere passage of time.[3]

3. This conclusion is supported by a list of the total sales of Showtime Books on a day-to-day basis. Sales at $15 dropped off substantially after November 27, and severely after December 2, 1963; sales at $12 dropped off substantially between November 23 and December 3, picked up again between December 3 and December 11, and then fell off substantially. Sales after December 17, of course, were even fewer in number, but the decline had set in sometime before. See defendants' exhibit 6.

The Court will therefore award plaintiff $1,000 as damages for loss of anticipated profits. To be sure, this figure is somewhat arbitrary, but a degree of arbitrariness and speculativeness is unavoidable in estimating damages of this kind.

The Court will also award plaintiff $300 for damage to its reputation as a result of defendants' breach. Plaintiff established by a fair preponderance of the evidence that its reputation and good will were damaged to a small extent— particularly in the eyes of one purchaser who had purchased about 250 Showtime Books as Christmas gifts for his employees. In fact, a number of witnesses (offered by plaintiff) who had attempted to use the Showtime Book coupons at the Trans-Lux Theatres and had been turned away at the box offices vented their anger more at defendants than at plaintiff. Thus the reputation of defendants may well have been damaged by their own breach. In any event, plaintiff's reputation was not substantially damaged.

Plaintiff has failed to prove by a fair preponderance of the evidence that any of its other operations, including its "Global Menu Club" book (which is similar to the Showtime Book except that it applies to restaurants), were damaged by defendants' breach of the Showtime contract.

3. The court will vacate the preliminary injunction heretofore entered.

On the Trans-Lux coupons in the Showtime Book there is printed the following language: "Void advance priced engagements." Defendants claim the right, under this language, to advance the price for certain pictures and on certain days of the week from the "regular" price of $1.65 or $1.80 to the special price of $2. Plaintiffs claim raising the prices in this manner violates the court injunction ordering defendants to honor the coupons when presented. In view of the serious dispute about the proper interpretation of this phrase, and the continuing difficulties which would face any court in attempting to decide which motion pictures are and which are not properly subject to an advance in prices, this Court has concluded that it is best to terminate the injunction. The Court will also, however, award plaintiff an amount to cover anticipated losses occasioned by refunds which plaintiff feels obliged to make to purchasers turned away at the Trans-Lux Theatres. Plaintiff's president testified that to the date of trial, refunds have been made for approximately 20 or 30 Showtime Books at the full purchase price of $15! The coupons for the Trans-Lux Theatres expire on October 31, 1964, and the Court will award damages of $375 to cover anticipated refunds from the date of trial to the date of expiration.[4] In any event, there may not be substantial need to make such refunds, since defendants may well have realized that the reputation of Trans-Lux suffers whenever one of the theatres refuses to honor a coupon.[5] The Court, in any event, will limit plaintiff to recovery of money damages.

4. Since the Court has determined that Rosenfeld had apparent authority to

4. In its pre-trial brief, defendants argued that the alleged contract with plaintiffs was void because it was too indefinite as to the number of books to be sold, as to the period within which books must be sold, as to the exact nature of defendants' corporate title, and as to mutuality of obligation on the part of plaintiff. However, the reasonable interpretation of the contract is that plaintiff was obligated to exert its best efforts to sell up to 5,000 books, and that the books would generally be sold in the winter and spring of 1963–1964, and in any event no later than October 31, 1964, when all of the coupons would have expired. Defendants are reasonably identified in the contract as "Trans-Lux Theatres."

5. Defendants will have to balance such loss of good will against out-of-pocket expense they will suffer as a result of honoring the coupons, since a number of the arrangements between the theatres and distributors require the theatres to pay for the "coupon" admissions as if they were fully paid admissions. It was these arrangements which led defendants to breach the contract with plaintiff in the first place.

enter the agreement with plaintiff in behalf of defendants, the counterclaim of defendants, claiming out-of-pocket losses for the coupons which have been honored at the box offices, must fail.

■ 5. Similarly, the third-party complaint by defendants against Rosenfeld must fail. As the Court has previously determined, Rosenfeld had apparent authority. He acted reasonably, in complete good faith, and not for his own benefit but rather for the benefit of his principal. Defendants (third-party plaintiffs) have failed to prove to the satisfaction of the Court by a fair preponderance of the evidence that Rosenfeld acted contrary to the best interests of his principal, or that he breached his duty to his principal.

Judgment will therefore be entered for plaintiff against defendants in the amount of $1,675 on the claim. The counterclaim and third-party claim filed by defendants will be dismissed. And the injunction heretofore entered will be vacated.