**APARTMENT AND OFFICE BUILDING ASSOCIATION OF METROPOLITAN WASHINGTON, a corporation, et al., Appellants,**

v.

**Walter E. WASHINGTON, Commissioner, et al., Appellees.**

**Walter E. WASHINGTON, Commissioner, et al., Appellants,**

v.

**APARTMENT AND OFFICE BUILDING ASSOCIATION OF METROPOLITAN WASHINGTON, a corporation, et al., Appellees.**

**Nos. 8985, 9083.**

District of Columbia Court of Appeals.

Argued Jan. 22, 1975.

Decided July 16, 1975.

---

Eric Von Salzen, Washington, D. C., with whom Kevin P. Charles and Daniel R. Stegall, Washington, D. C., were on the brief, for appellants and cross-appellees in Nos. 8985 and 9083, respectively.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, Louis P. Robbins, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellees and cross-appellants in Nos. 8985 and 9083, respectively.

Michael R. Klein, Neil J. King and Ann K. Macrory, Washington, D. C., were on the brief of applicant tenants as amici curiae.

Before REILLY, Chief Judge, and FICKLING and NEBEKER, Associate Judges.

NEBEKER, Associate Judge:

■ These interlocutory appeals[1] arise from the denial of appellant-plaintiffs' request for a declaratory judgment and a permanent injunction against enforcement of District of Columbia Regulation No. 74–20 (hereinafter Regulation), which established rent control and a Housing Rent Commission (hereinafter Commission) for the District of Columbia on August 1, 1974. The Regulation was enacted pursuant to the District of Columbia Rent Control Act of 1973 (the Act).[2] Appellants (hereinafter landlords; *see* note 1, *supra*) are the Apartment and Office Building Association of Metropolitan Washington, The Washington Board of Realtors, and several corporations, partnerships, joint ventures, and individuals owning various rental residential units in the District of Columbia. The Act authorized the District of Columbia City Council (hereinafter City Council) to

> adopt such rules as it determines necessary and appropriate to regulate and stabilize rents in the District of Columbia . . . except that any such rules . . . shall provide means whereby increased costs incurred by such landlord . . . shall be taken into consideration in determining the amount of such rents . . . which such landlord is entitled to receive . . . .[3]

The landlords contend that the trial court erred in failing to hold as a matter of law that the rent control program exceeded the statutory authority of the City Council and was void for failure to provide (assuming imposition of rent controls) a workable method to vindicate the landlords' statutory right to a meaningful method of passing on increased costs. Although we do not

hold the regulation to be void, we do agree that a condition precedent to enforcement of rent control is a viable means whereby landlords may recoup the amount of increased costs to which they are entitled. Our judgment affirms in part, reverses and vacates in part, and remands with instructions for future disposition of the case.

On November 21, 1973, the District of Columbia Rent Control Act became law. The Act authorized the City Council to establish a temporary District of Columbia Housing Rent Commission (§ 45–1623(a)) to hold hearings regarding a known and apparent shortage of rental residences, and to adopt necessary rules and regulations for administration of any such assumed responsibilities (§ 45–1622(a)). As mentioned, the Act required in any rule or regulation a means, commonly referred to as a "pass-through", whereby increased costs could be taken into consideration in determining the amount of rent. The Act contained a provision authorizing the Commission to grant exemptions to landlords who could show serious financial hardship (due to the regulations promulgated), and provided that in such cases affected tenants would receive notice and be given an opportunity to present evidence (§ 45–1623(d)(2)). The Act also contained a provision for judicial review in Superior Court through an action by any person aggrieved by a decision of the Commission or by the failure of the Commission to act (§ 45–1625(a)).

Public hearings were held in January 1974. On May 31, 1974, the City Council passed Regulation No. 74–13,[4] imposing a "rent freeze" in the District of Columbia for June and July of 1974. In a suit thereafter in the Superior Court to enjoin the

---

1. *See* D.C.Code 1973, § 11–721(a)(2)(A). We treat the landlords as principal appellants, recognizing the importance the government places on its cross-appeal (No. 9083) from the refusal of the trial court to permit a rollback of rents.

2. D.C.Code 1974 Supp., § 45–1621 *et seq.*

3. *Id.*, § 45–1622(a).

4. This Regulation, never published in the D. C. Register, was identical to previous Regulation No. 74–9, 20 D.C. Register 1063 (April 29, 1974). *See* D.C.Code 1973, § 1–1506(c), which requires publication in the Register.

"freeze", the "freeze" was upheld because of its temporary nature, despite the absence of a provision for increased costs incurred by landlords during the moratorium.[5]

On August 1, 1974, the date of the expiration of the "rent freeze", the City Council passed Regulation No. 74–20,[6] the subject of these appeals. This Regulation included provisions which

(a) established a temporary District of Columbia Housing Rent Commission (§ 8) (which has been extended by action of the new City Council, the succeeding legislative authority to Congress under the District of Columbia Self-Government Reorganization Act);[7]

(b) set a base rent ceiling for all rental accommodations of 112.32% of the rent which was in effect on February 1, 1973 (§ 5b);

(c) required rents in excess of this ceiling to be "rolled back" to this ceiling as of the next regular rental date after the Regulation's promulgation (§ 5d);

(d) required thirty days' notice to a tenant before a rent increase could be effective (§ 5 *l*);

(e) authorized the Commission to make adjustments for landlords and tenants, based on hardship, as long as notice is given to the other party of the right to request a hearing (§ 7b);

(f) ordered the Commission to seek to maintain "maximum rents . . . which will yield . . . a reasonable return" for landlords (§ 6a); and

(g) required the Commission to act upon landlords' and tenants' hardship petitions within sixty days of the date of filing (§ 7a).

Shortly thereafter, the landlords instituted this class action against the municipal officers of the District on behalf of all rental residence landlords in the District subject to rent control. They initially sought a declaratory judgment and preliminary injunction against the specific provision in § 5d of the Regulation requiring landlords to "roll back" their rents, but this rent was denied. They then filed a further motion for a permanent injunction against the administration of the entire program under the Regulation.

■ Although the landlords described this suit as a class action, they failed to comply with the requirement in Super.Ct. Civ.R. 23–I(a) that the plaintiff file a motion requesting the court to certify that the action may be maintained as a class action. Moreover, the trial court, although it later granted partial relief to landlords as a class, failed: (1) to comply, sua sponte, with the requirement in Super.Ct.Civ.R. 23(c)(1) and R. 23–I(c) that the court determine whether the action is maintainable as a class action as soon as practicable after institution of the action, and (2) to comply with the requirement in Super.Ct. Civ.R. 23(c)(3) that the judgment in a Rule 23 class action include and describe those whom the court finds to be members of the class.[8]

---

5. *Apartment and Office Bldg. Ass'n of Metropolitan Washington v. District of Columbia*, C.A. No. 3699–74 (D.C. Superior Court Order filed June 14, 1974). No appeal was taken in this case.

6. 21 D.C. Register 289 (August 6, 1974).

7. Pub.L. No. 93–198, 87 Stat. 774 (Dec. 24, 1973). Substitution of the members of the new City Council has been made under Rule 43(c) of the Rules of this court.

8. The complaint was framed in terms of both a Rule 23(b)(2) ("the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole") and a Rule 23(b)(3) ("questions of law or fact common to members of the class predominate over any questions affecting only individual members, and . . . . a class action is superior to other

At the evidentiary hearings on the pre-liminary and permanent injunctions, the landlords offered testimony and evidence by way of a research study to show that the across-the-board rent increase of 12.-32% was unfair. They also sought to show that under the mechanics of the hardship provisions in sections 6 and 7 of the Regulation, the Commission was inca-pable of implementing the statutorily re-quired pass-through by permitting prompt rent increases reflecting increased costs. The trial court denied the "permanent injunction . . . pending a hearing on plaintiffs' complaint to declare . . . [the] Regulation . . . inval-id." However, the trial court held in its conclusions of law that the hardship reme-dies were "not currently available through the hearing Commission" and accordingly granted relief to appellants as a class by staying the rollback requirement with re-spect to any landlord who had petitioned the Commission pursuant to the hardship provisions in sections 6 and 7 of the Regu-lation. (Absent class action determination by the trial court, *see* note 8 *supra,* and ac-companying text, we do not view this selection of beneficiaries of the stay of the rollback as class-member identification.) The landlords appeal from the denial of the permanent injunction. The District of Columbia officials cross-appeal from the order granting a stay of the rollback provi-sion.

### The Landlords' Contentions

The argument that enforcement of rent control exceeds the statutory authority of the City Council by not possessing a work-able pass-through mechanism has several prongs. First, it is argued that the "one-shot" rent increase of 12.32% in § 5 of the Regulation does not satisfy this pass-

through requirement and that even if it were assumed that this increase is the reg-ulatory mechanism initially implementing the pass-through right, the across-the-board application of the 12.32% rent in-crease to all landlords, regardless of cir-cumstances, is unfair in that it is inade-quate for some of them. In this context, it is further argued that even if the 12.32% rent increase were assumed to satisfy the pass-through requirement and an across-the-board application of a rent increase formula were assumed to be fair, this par-ticular increase would still be inadequate since, according to the research study, the average cost increase to landlords prior to the Regulation was 15.3%, not 12.32%.[9]

Secondly, they contend that the provi-sions in sections 6 and 7 of the Regulation for hardship petitions by landlords do not fulfill the pass-through requirement be-cause these provisions are analogous to, and implementations of, a separate stat-utory policy regarding hardship exemptions for landlords (§ 45–1623(d)(2)), not the different policy in the Act regarding a cost pass-through right (§ 45–1622(a)). Fur-ther, they contend that even if it is as-sumed that sections 6 and 7 are the Regu-lation's implementation of the pass-through requirement, sections 6 and 7 nevertheless do not satisfy the requirement because the Commission has already exhibited its ina-bility to handle the determination of the landlords' petitions under sections 6 and 7. Their final contention is that prohibiting the landlords from raising rents without notice and a hearing to the landlords is a violation of due process.

### The Counter-Contentions

In response, the government argues that the 12.32% rent increase in § 5 satisfies

---

available methods for the fair and efficient adjudication of the controversy") type of class action.

Moreover, although the trial court held in its conclusions of law that appellants "and others similarly situated" were entitled to

partial relief, this description of the members of the class lacks adequate specificity.

9. *See* text *infra,* at 330, which discusses the critical distinction between increased costs and increased rent (covering return on invest-ment as well as cost of operation).

**329**

the pass-through requirement but that even if it were assumed that § 5 does not satisfy the requirement, the procedure in sections 6 and 7 for hardship petitions by landlords does satisfy the pass-through requirement. It also contends that the landlords lack standing to seek judicial review since they have failed to exhaust their administrative remedies in the Commission (by filing a § 45–1625(a) suit after expiration of the 60-day period in § 7a of the Regulation, *supra*); that the landlords' cause of action is nonjusticiable and not ripe for judicial resolution because of the uncertainty whether the procedure for disposing of hardship petitions by landlords will indeed be unworkable; and that the granting of class action relief to appellants was improper.

With respect to the District of Columbia's cross-appeal from the stay of the roll-back provision, it is argued that the stay was effectively a hardship exemption for landlords which, pursuant to § 45–1623(d)(2) of the Act and sections 6 and 7 of the Regulation, cannot be awarded absent notice and a hearing for affected tenants. The government also argues that the stay was a "rent increase" in violation of § 5 *l* of the Regulation, which requires a thirty-day notice to the tenant before a "rent increase" can be effective.

*The Rent Control Regulation Fails to Comply With the Act*

▮▮▮▮ We begin our analysis with the proposition that "the Commissioners [the District of Columbia City Council], being mere agents of the Congress, have only such authority to promulgate regulations as the Congress has specifically vested in them in any given field." *Jones v. District of Columbia,* 212 F.Supp. 438, 441 (D.D.C. 1962), *aff'd,* 116 U.S.App.D.C. 301, 323 F.

2d 306 (1963). Here the Congress required that in the event of adoption of rent control rules by the Council there be a "means whereby increased costs incurred by . . . landlord[s] . . . shall be taken into consideration . . . ."[10] An inquiry into the legislative history of this provision in the Act is instructive and reveals the clear intent of Congress that prompt, and therefore meaningful, cost pass-through procedures are mandatory in order to protect the landlords against uncontrollable costs and the rental community from a housing shortage due to the withdrawal of rental property.

The committee is well aware that the rental property industry is not as subject as some industries to "cost-push" influences that require other industries to increase their prices. Rental increases generally result from a "demand-pull" situation. However, there are certain cost increases over which property owners have no control. Accordingly, it is expected that any controls which may be imposed *will allow rent increases necessary to cover increases in uncontrollable operating expenses (fuel, utilities, taxes, etc.).*[11] [Emphasis supplied.]

The Senate Report regarding the pass-through requirement further stated:

The Council is prohibited from adopting rent controls which would not allow some reasonable pass-through provision to allow for [a] landlord's increased costs. . . .[12]

\* \* \* \* \* \*

The full committee decided to amend the bill . . . to restrict the [City] Council from imposing controls *that don't allow rental increases to cover legitimate ownership costs.*[13] [Emphasis supplied.]

---

10. The District of Columbia Rent Control Act of 1973, D.C.Code 1974 Supp., § 45–1622(a).

11. S.Rep. No. 93–384, 93d Cong., 1st Sess. 3–4 (1973).

12. *Id.* at 5–6.

13. *Id.* at 7.

Hence, the City Council exceeded its statutory authority if Regulation No. 74–20 did not possess a workable pass-through mechanism.

■ For the following reasons, we conclude that a workable pass-through mechanism is a necessary concomitant of a rent control program. First, the rent ceiling formula of 12.32% increase in § 5 does not satisfy the pass-through requirement since it acts as a single, isolated increase with no future flexibility for compensating for uncontrollable operating costs. That general increase seems more in the nature of an effort to permit rents to catch up with increased costs and to maintain a reasonable return in view of the earlier rent freeze and inflationary conditions.

■ Nor do the provisions in sections 6 and 7 for landlord hardship petitions satisfy the pass-through requirement. Sections 6 and 7 are the implemention of § 45–1623(d)(2) in the Act, which allows the Commission to grant hardship exemptions to landlords. Sections 6 and 7 are not the implementation of the pass-through requirement provision in § 45–1622(a) of the Act since that requirement is separate from the hardship exemption provision in the Act, revealing that Congress treated these two provisions as distinct, non-related matters.[14]

■ Even assuming, however, that sections 6 and 7 of the Regulations constitute the pass-through mechanism, the rent control program still fails to pass muster because administrative implementation of sections 6 and 7 is shown by the record to be bootless as a means ·of providing a meaningful pass-through of increases in uncontrollable operating costs. This is made unmistakably clear by a recent statement from the Commission to the City Council showing the former's case load status.[15] As of March 14, 1975,[16] 501 petitions for hardship adjustments had been received from landlords. Only 54 of these petitions had been decided by Commission hearing examiners, and only 14 had been reviewed by the Commission.[17] More dispositive for this ·holding, though, is the fact that 279 of these 501 petitions have been returned to the landlords who filed them because the Commission admitted its administrative inability to decide the petitions within the required 60 days of § 7a of the Regulation.

On March 14, 1975, a total of 208 petitions remained to be decided by the Commission. At the Commission's present rate of decision, approximately 5 to 7 cases per week, the Commission will be unable to decide more than one-fourth of these 208 petitions within the next 60 days and will

---

14. Congress also treated the pass-through requirement and the hardship exemption as separate concerns in the Phase II Rent Stabilization Regulations. *See* Rent Stabilization Reg., 6 C.F.R. §§ 301.101(a)2 & 301.301 (1972) for former, and § 301.108 (1972) for latter.

Nevertheless, the City Council's action in providing for the handling of petitions for pass-throughs and hardship exemptions on the same application form and in the same proceeding may well be reasonable as long as the petitions for pass-throughs and hardship exemptions are considered independently. *See Train v. Natural Resources Defense Council,* 421 U.S. 60, 95 S.Ct. 1470, 43 L. Ed.2d 731 (1975). To be sure, there is much interrelation between the two concepts as rent revenue must be adequate to recoup increased costs and maintain a maximum re-

turn on current investment. We leave to the trial court on remand the task of treating the issue raised by the landlords respecting the complexity of the forms used, which probably contributed to the inablity of the Commission to discharge its duty.

15. Statement of the Commission to the Committee on Housing and Urban Development of the new City Council, March 20, 1975. This statement was submitted in a post-argument memorandum filed without objection.

16. Petition forms became available on November 8, 1974.

17. Section 5.4 of the Commission's Rules of Practice and Procedure provides for review of the hearing examiner's determination by the Commission itself. *See* 21 D.C. Register 2162 (March 10, 1975).

again have to return the undecided petitions to the landlords. As the Commission stated in its report, "[V]ery few if any new petitions can be considered in the months ahead."[18] These facts, coupled with the Commission's procedure of giving priority to both the refiled petitions (some of the 279 returned petitions) and the cases remanded to the Commission by the Superior Court after suit by a landlord, convince us that the hardship adjustment procedure is inherently incapable of functioning as the required pass-through mechanism. Despite the fact that a maximum 60-day limit for agency actions seems reasonable, appellants' statutory rights become totally illusory if the system charged with protecting them becomes so lethargic and cumbersome as to be inoperable.[19] Hence, Regulation No. 74–20 was promulgated without even a meaningful expectation of implementing the required pass-through right, despite the purported method of dealing with the matter.[20]

■ For the same reasons we reject the government's arguments in its cross-appeal from the stay of the rollback provision. As the trial court stated in its conclusions of law, the "remedy provided by sections 6 and 7 of the Regulation for seeking hardship adjustment . . . is not currently available through the hearing Commission." The order staying the rollback recognized in part the failings of the Commission and the adverse economic position of the landlords, and, although the trial court did not go far enough, it did not err in staying the rent rollback.[21]

### Standing, Justiciability, and Class Action Status

Finally, we consider the government's contentions that the landlords lack standing to seek judicial review; that the case is not justiciable or ripe for decision; and that the granting of class action relief by the trial court was improper.

■ As to the first of these contentions, the landlords clearly have standing pursuant to § 45–1625 to seek judicial review in the Superior Court of the failure of the Commission to act upon the previously mentioned 279 landlord petitions within the required 60 days of § 7a of the Regulation. Section 45–1625 permits "any person or class of persons aggrieved . . . by any failure on the part of the Commission to act" to seek judicial review in the trial court by appropriate pleading. The landlords also fit within the three-pronged standing test synthesizing recent Supreme Court cases which this court accepted in *Basiliko v. District of Columbia;*[22] they have alleged injury in fact through the loss of increased rent because of the failure of the Commission to decide upon the petitions seeking such relief; they have alleged that they are within the zone of interest which the Regulation and statute at issue are designed to protect; and they have further alleged that there is no clear and convincing indication of a legislative intent to preclude judicial review.

■ Moreover, judicial review is not precluded here by the principle of "Exhaustion of Administrative Remedies". This case does not present an "exhaustion"

---

18. Statement of the Commission, *supra* note 15, at 2.

19. *Cf. Freeport Hall Associates v. Herman,* 40 Misc.2d 793, 243 N.Y.S.2d 867 (Sup.Ct. 1963).

20. In view of our holding, we do not reach the landlords' final contention that prohibiting further rent increases without notice and hearing to the landlords constituted a denial of due process.

21. Consequently, appellees' arguments, *supra,* that the stay of the rollback provision was an impermissible hardship exemption (under § 45–1623(d)(2) of the Act and sections 6 and 7 of the Regulation) and an impermissible "rent increase" (under section 5 *l* of the Regulation) are without merit.

22. D.C.App., 283 A.2d 816, 818 (1971).

problem since it is not a suit to review agency action but an attempt to invalidate the very regulation upon which the agency is based. *See Berger v. Board of Psychologist Examiners for the District of Columbia,* D.C.App., 313 A.2d 602, 604–605 (1973). Further, there is no meaningful remedy to exhaust because of the previously mentioned administrative inability of the Commission to decide the petitions. It is settled that no requirement of exhaustion of administrative remedies exists if the attempt to exhaust would be futile. *Smith v. Illinois Bell Telephone Co.,* 270 U.S. 587, 591, 46 S.Ct. 408, 70 L.Ed. 747 (1926); 3 K. Davis, Administrative Law Treatise § 20.07 (1958 ed., 1970 Supp.); Note, *Judicial Acceleration of the Administrative Process: The Right to Relief from Unduly Protracted Proceedings,* 72 Yale L.J. 574 (1963). As to the argument of the District of Columbia that the landlords' proper legal remedy is to wait 60 days and then commence an action in the Superior Court pursuant to § 45–1625, we hold that the trial court did not abuse its discretion in taking equitable jurisdiction in this case, particularly in light of the fact that the aforementioned legal remedy would entail a multiplicity of actions by distressed landlords.

■ As to the second of the government's contentions regarding justiciability, the admission by the Commission of its inability to process the landlords' hardship petitions renders the landlords' claims of lost rental income concrete rather than abstract or hypothetical. The issues are appropriate for judicial review, and denial of review would impose great financial hardship. *See Abbott Laboratories v. Gardner,*

387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Association v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed. 2d 697 (1967). *Cf.* D.C.Code 1973, § 1–1510, in reference to "rules of law" for judicial review of "agency action unlawfully withheld or unreasonably delayed".

■ The government's final contention, that the granting of class relief to appellants was improper since the entitlement of a landlord to a rent increase varies so greatly from case to case that there can be no common question of law or fact, should be considered on remand to the trial court in light of what we have said and the nature of the remedy we fashion. Furthermore, the result of the trial court's failure to determine whether the action is maintainable as a class action, pursuant to Super.Ct.Civ.R. 23(c) and 23–I(c), is that the relief granted is valid as to the named plaintiffs but not as to the class which they sought to represent.[23]

### Conclusion

■ We direct the trial court on remand to determine, pursuant to Super.Ct. Civ.R. 23(c)(1), whether this suit is maintainable as a class action,[24] and to amend its final order, if necessary, so as to include and describe those whom the court finds to be members of the class. We affirm the judgment insofar as it stayed the rollback provision. We vacate so much of the judgment as denied the permanent injunction, and remand for further proceedings. *See* D.C.Code 1973, § 17–306.

While we doubt the necessity of affording all the relief sought by the landlords (injunction against enforcement of rent

23. *Dorfmann v. Boozer,* 134 U.S.App.D.C. 272, 275 n. 8, 414 F.2d 1168, 1171 n. 8 (1969).

24. *Id.* We would also note that the Supreme Court has recently held that a trial court has no "authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jac-*

*quelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974).

We nonetheless believe that our treatment of the merits of this case is necessary and that the certification question must, in any event, be treated. We do not have occasion to deal with the significance of the rollback relief to the asserted class in the absence of certification.

control which would permit all rents to be raised to the extent economically tolerable), we conclude that lesser, meaningful relief is in the public interest and should be afforded. *See Hecht Company v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L. Ed. 754 (1944); *Blair v. Freeman,* 125 U. S.App.D.C. 207, 217, 370 F.2d 229, 239 (1966). To this end, and without presently enjoining the enforcement of the rent control program, the government should be given 90 days from the date of transmittal of our mandate to adopt and implement means of affording reasonably prompt vindication of the so-called pass-through right and the right to a reasonable return.[25] We leave it to the trial court in the first instance to determine the reasonableness and workability of these means. As to the interim, the trial court is directed to determine whether the 12.32% across-the-board increase is sufficient for these purposes or whether an additional amount of increase is necessary to the statutory ends. In the event of the latter, that court may decide on ordering a general increase for all plaintiffs and members of the class as may be determined after class certification action, or to make individual determinations as requests for specific rent increases can demonstrate their merit.

*So ordered.*

REILLY, Chief Judge (concurring):

In my view the challenged regulations of the Council were fatally defective in assuming that the statutory right of landlords to be reimbursed in terms of higher rentals for recurring increases in such uncontrollable operating expenses as fuel prices, utility rates, and real estate taxes, was conditioned upon advance administrative approval obtainable only after an evidentiary hearing preceded by a published notice affording an opportunity for affected tenants to appear and present countervailing evidence.

Such a hearing is indeed required by § 4(d)(2) of the D. C. Rent Control Act of 1973, § 45–1623(d)(2) (Supp.I, 1974), as a condition precedent to the grant of an exemption from a rule which "would cause serious financial hardship to a landlord . . . ." But this provision should not be confused with the "pass-through" requirement which appears in § 3(a) of the Act, *id.* § 45–1622(a), and conditions the basic grant of authority to make rules stabilizing rents upon the establishment of a mechanism so that any ceiling imposed will reflect increases in operating costs.[1] In short, the statute contemplates fluctuating ceilings on every piece of rental property, irrespective of whether it is a dwelling house, an apartment, or merely a single room in a lodging house. In view of the multiplicity and variety of rental units, it is readily apparent that the condition precedent to the imposition of any rule (*i. e.,* rent ceiling) applicable to a given unit, *viz.,* an allowance above the base period for interim increases in cost, is not satisfied by a system which first fixes the appropriate rental without taking into account the factor of the particular increased costs, thus forcing the owner to absorb such costs until he has convinced the Council in a series of mini-trials that an upward adjustment of the fixed rent is called for.

---

25. Section 6a of the Regulation states that in deciding upon hardship petitions "the Commission . . . shall observe the principle of maintaining maximum rents for housing accommodations at levels which will yield to the landlords a reasonable return from such housing accommodations."

1. § 45–1622. * * *
    (a) . . . except that any such rules so adopted to stabilize and regulate the amount of rent or benefits which a landlord is entitled to receive for the use or occupancy by any tenant of any residence shall provide means whereby increased costs incurred by such landlord and directly related to such residence shall be taken into consideration in determining the amount of such rents or benefits which such landlord is entitled to receive in connection with such use or occupancy under such rules. . . .

In the current period of inflation, the problem of coping with rising tax valuations on real estate, mounting fuel and utility costs, and higher wages, is one that is universal to all owners of rental property. This problem is obviously quite different from the unique situations with which the exemption section, 45–1623(d)(2), *supra,* was enacted to cover. Congress presumably had in mind such unusual cases as apartments actually operating at a loss on the base date because of nonprofitable leases or rented buildings which had deteriorated so much that enormous rehabilitation expenses had to be incurred to make them legally tenantable, but felt that only evidence produced at an adversary hearing would justify so drastic a step as exemption from the general rules. As such cases would not be numerous, it plainly would not be administratively impracticable to compel the agency to hold hearings on those applications. But certainly the statute never contemplated that the exemption cases and the pass-through cases should be treated alike. Therefore, by adopting such cumbersome procedures as a necessary part of the pass-through process, the regulations were facially deficient as was amply proved by the evidence of the Commission's inability to meet even its own 60-day deadline in processing applications for allowance of increased costs.

The Council has attempted to justify this flaw in Regulation No. 74–20 by pointing out that its base rent ceiling, which is 12.-32% above the rent in effect on February 1, 1973, for any given unit, takes into account the *average* increase in cost since that date and the date of the regulations. Appellants challenge this figure as being 2% below the real average and it was conceded by the government in oral argument that it does not take into account the cost of repairs required by Housing Code inspectors or rises in mortgage interest on buildings recently refinanced. In any event, it does not cover individual above-average costs, as Judge Nebeker observed

in his opinion, nor increases since the publication of the regulation.

Conceivably, in a period of stable prices, stable wages, and stable taxes, the number of cases in which landlords would need higher rents to compensate them for higher costs would be so small that it could be said that the challenged procedures for the exercise of pass-through rights provided a workable scheme. But this is not such a period.

In my opinion, the fact that the statute (§ 45–1625(a)) provides judicial review in the Superior Court for the failure of the Rent Control Commission to act, is no answer to the problem. Congress did not direct the Superior Court to administer and enforce pass-through rights but, as has been pointed out, conditioned any rent control regulations upon the inclusion as an integral part thereof an effective procedure for passing on increased costs to tenants. It is not the business of this court to prescribe what this procedure should be. Conceivably a regulation requiring that a proposed rent increase could become effective only if accompanied by the filing of an explanatory statement of costs with both the Commission and the affected tenant would suffice, in view of the authority of that agency to audit and inspect any documents relied upon to support a challenged rent increase. This is the kind of procedure the Internal Revenue Service has relied upon with respect to tax returns and salary stabilization problems. As this case is being remanded to the Superior Court, however, that tribunal in framing its order might well consider after hearing the views of the parties, such amendments to the regulations as are necessary to effectuate the Congressional purpose.

FICKLING, Associate Judge (dissenting in part and concurring in part):

There are two issues presented to this court for resolution: (1) whether it was error to permit the landlords (appellants) to deviate from rent ceilings imposed by

the Council where it was shown that it was impossible to secure relief in hardship cases due to the lack of resources in the administrative machinery, and (2) whether it was error not to hold District of Columbia Rent Control Regulation No. 74–20 invalid.

Since I cannot quarrel with the majority's resolution of the first issue, I turn immediately to the second issue. The question is whether the Regulation is facially invalid or, stated another way, does the Regulation provide for a pass-through of increased costs incurred by the landlords. In my view, the Regulation does provide for "pass-through" of increased costs as mandated by Congress, and, accordingly, the Regulation is valid.

Congress directed the Council to hold hearings and determine whether there was a need for rent control. If such a need existed, the Council was authorized to pass appropriate regulations to expire one year from the date of enactment provided there was a pass-through of increased costs. Extensive hearings were held, including testimony concerning increased costs of the landlords. As a result of these hearings, Regulation No. 74–20 was enacted. Within a few weeks of the appointment of the Commission, the appellants filed this action in the trial court attacking the validity of Regulation 74–20 on the ground that the 12.32% increase in rents was inadequate to cover their increased costs and that the Commission could not handle hardship cases within the 60 days mandated by the Council because of the lack of resources.

I turn to the question of whether the Regulation on its face provides for "pass-through" of increased costs of the landlord. Unlike the majority, I analyze and interpret Regulation 74–20 as a whole since it was enacted as a whole (and not in parts or sections). *See* 2A Sutherland, Statutory Construction § 46.05, pp. 56–57 (C. Sands ed. 1973). The Regulation, as accurately summarized by the majority (1) set a base rent ceiling for all rental accommodations of 112.32% of the rent which was

in effect on February 1, 1973 (Sec. 5b); (2) ordered the Commission to seek to maintain "maximum rents . . . which will yield . . . a reasonable return" for landlords (Sec. 6a); (3) authorized the Commission to make adjustments for landlords and tenants based on hardship, provided notice is given to the other party of the right to request a hearing (Sec. 7b); and (4) required the Commission to act upon landlords' and tenants' hardship petitions within sixty days of the date of filing (Sec. 7a).

It must be kept in mind that the Council passed the Regulation after conducting extensive hearings on the matter of landlords' increased costs. After hearing evidence both pro and con, the Council concluded that a 12.32% increase was a reasonable amount to cover increased costs and allow a reasonable return on the investment. In addition, the Regulation provided that if 12.32% did not allow a reasonable return, the landlord could file a hardship petition which was required to be acted upon within 60 days. If no action was taken within 60 days or if the action taken was not satisfactory, the landlord had a right to appeal to the court.

Utilizing this holistic analytical approach, Sections 5, 6 and 7 of Regulation 74–20, when considered together, constitute a comprehensive, flexible and facially workable pass-through scheme which is for one year only.

Next, I disagree with the majority's conclusion that the validity of a regulation depends on the manner in which the regulation is implemented and administered. To the contrary, a statute or regulation is not facially invalid due to administrative implementation difficulties. In *New v. Atlantic Greyhound Corp.*, 186 Va. 726, 43 S. E.2d 872 (1947), the Supreme Court of Virginia stated:

Possible difficulties in the enforcement of a statute do not establish its invalidity. They may effect the result of en-

forcement; but they do not involve legal principles in the interpretation and construction of statutes. They present questions for legislative consideration and correction, if modification or repeal be deemed necessary and proper.

*See also Harrell v. Sullivan,* 220 Ind. 108, 40 N.E.2d 115 (1942). Because a statute or regulation is unworkable due to lack of personnel does not mean it is facially invalid. Such problems are for the legislative body to correct. In this regard, I would note that, as of this date, new regulations are being considered by the Council.

Therefore, I would affirm the trial court's action.