Jerome S. **WAGSHAL,** Appellant,

v.

Barbara **SELIG,** Appellee.

No. 11928.

District of Columbia Court of Appeals.

Argued Dec. 13, 1977.

Decided June 22, 1979.

Jerome S. Wagshal, Washington, D. C., pro se.

Randell Hunt Norton, Washington, D. C., for appellee.

Before NEBEKER, YEAGLEY, and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellant (landlord) sued appellee (tenant) in the Small Claims Branch of the Superior Court to recover unpaid rent and the cost of cleaning and repairing the landlord's apartment after the tenant left it. The tenant counterclaimed for the return of, or compensation for, a sofa and a rug of hers which remained in the apartment after the tenant's departure. The trial court denied the landlord's claim for back rent, but granted him judgment in the amount of $50 for the cleaning and repairs which were required in the apartment. The court further granted the tenant judgment in the amount of $50 for the rug, and ordered the landlord to return the sofa to her or suffer an additional judgment against him in the amount of $800. In compliance with that order the landlord shipped the sofa, at his expense, to the tenant's new residence. The landlord contends that the trial court's denial of the claim for unpaid rent and its order that the landlord return the couch to the tenant at his expense were erroneous. We agree, and reverse.

## I

The tenant leased an apartment from the landlord on June 3, 1974, for a monthly rental of $285. The lease covered a one-year period, and was to continue thereafter on a month-to-month basis at the same rental. The monthly rental payments of $285 were paid for June, July, August, and September of 1974.

On August 1, 1974, the District of Columbia City Council passed Regulation No. 74–20.[1] The regulation included provisions which, as we previously have summarized them,

(a) established a temporary District of Columbia Housing Rent Commission (§ 8) (which has been extended by action of the new City Council, the succeeding legislative authority to Congress under the District of Columbia Self-Government Reorganization Act);

(b) set a base rent ceiling for all rental accommodations of 112.32% of the rent which was in effect on February 1, 1973 (§ 5b);

(c) required rents in excess of this ceiling to be "rolled back" to this ceiling as of the next regular rental date after the Regulation's promulgation (§ 5d);

(d) required thirty days' notice to a tenant before a rent increase could be effective (§ 5l);

(e) authorized the Commission to make adjustments for landlords and tenants, based on hardship, as long as notice is given to the other party of the right to request a hearing (§ 7b);

(f) ordered the Commission to seek to maintain "maximum rents . . . which will yield . . . a reasonable return" for landlords (§ 6a); and

(g) required the Commission to act upon landlords' and tenants' hardship petitions within sixty days of the date of filing (§ 7a). [*Apartment & Office Building Association v. Washington*, D.C.App., 343 A.2d 323, 327 (1975) (hereinafter cited as *AOBA I*) (footnote omitted).]

Pursuant to that regulation, in October 1974 the tenant began making rent payments at a reduced rate of $219.02. This figure was derived by multiplying $195, the rent for the apartment on February 1, 1973, by 112.32% in accordance with Regulation 74–20. The tenant thus in effect received a monthly rental reduction of $65.98, the difference between her actual payments for those months and the agreed-upon rent. The tenant paid rent at the reduced rate for ten months, from October 1974 through July 1975. The total difference in rent between that called for by the lease and the amount payable under the regulation, for which the landlord brought suit, is therefore $659.80. The landlord notified the tenant by letter in September 1974 that a suit had been filed in the Superior Court challenging Regulation No. 74–20, and advised her that if the suit were successful after the required reduction went into effect, the

1. 21 D.C.Reg. 289 (Aug. 6, 1974).

tenant's rent would be "re-adjusted to your present rent."[2]

On July 16, 1975, in *AOBA I, supra*, this court held that Regulation 74–20, as it had been implemented by the Rent Commission, was invalid as beyond the scope of the City Council's statutory authority because it failed to provide a workable mechanism whereby landlords could pass increased costs through to their tenants—a requirement established by the District of Columbia Rent Control Act of 1973.[3] We concluded that the congressional mandate could not be fulfilled by the provisions of the regulation allowing the Rent Commission to grant hardship exemptions to landlords, and that, even if it could be, the hardship procedure was so slow of effectuation as to be "inherently incapable of functioning as the required pass-through mechanism." 343 A.2d at 331. We therefore took steps to remedy the situation so that the regulation as implemented in the future would operate within the bounds of authority granted to the City Council by Congress. The government was given 90 days within which to adopt and implement means of affording reasonably prompt vindication of the landlord's rights to pass-through his increased costs and to achieve a reasonable return. 343 A.2d at 333.

On July 25, 1975, nine days after the decision in *AOBA I*, appellant-landlord filed an application with the Rent Commission seeking to increase the rent for his tenant's apartment to $285 per month (the amount provided by the lease). That petition was granted on September 30, 1975, and the increase was ordered to become effective five days thereafter. The tenant paid rent at $285 per month for nine months, from August 1975 through April 1976.[4]

The tenant gave proper notice that she would vacate the apartment as of May 2, 1976. She left the apartment before that date and moved to New York. On or about April 30, 1976, the tenant's brother came to the apartment to remove her furniture. After the brother had removed some of the tenant's belongings, the landlord ordered him off the premises. The brother obeyed the order and left without removing his sister's sofa and a rug.

## II

We first address appellant's claim that the trial court erred in denying him the difference between the lower rent paid by the tenant during the period of unlawfully-established rental rollback (prior to the granting of the requested increase) and the amount of rent established by the lease during that period.

Appellant argues that since the regulation which provided for the rollback of rents was declared invalid (as it had been implemented prior to our decision in *AOBA I* because it was beyond the scope of authority granted to the City Council by Congress in the enabling legislation), we must look solely to the lease to determine the rights and obligations of the parties with respect to rental payments.[5] The ultimate

2. That letter stated in part:

Under the new District of Columbia Rent Control Act, your rental will be reduced to $219.02 effective 10–3–74. However, a suit has been filed in the Superior Court against this Act. If the Court should uphold the plaintiffs' position after the reduction has been made, the rent will then be re-adjusted to your present rent.

3. D.C.Code 1974 Supp., §§ 45–1621 *et seq.* Section 45–1622(a) provided that the City Council could

adopt such rules as it determines necessary and appropriate to regulate and stabilize rents in the District of Columbia . . . except that any such rules . . . shall provide means whereby increased costs incurred by such landlord . . . shall be

taken into consideration in determining the amount of such rents . . . which such landlord is entitled to receive . . . .

4. It is unclear from the record why the tenant paid the higher rent for the months of August and September 1975, since the Rent Commission's order did not become effective until October 1975.

5. Appellant also argues that the regulation was unconstitutional as violative of due process. In view of our disposition of the case on the ground of the regulation's invalidity as being beyond the authority of the City Council, we need not reach this issue.

focus of our analysis, therefore, is upon how the existence of the apparently valid regulation prior to its invalidation in *AOBA I* for the period before that decision affected the rights and obligations of the parties to this case.[6]

In recent years the Supreme Court and many state courts have turned away from the once-popular "void ab initio" rule as to the consequences of a statute's being declared invalid. *See generally Perkins v. Eskridge*, 278 Md. 619, 366 A.2d 21 (1976). That rule was perhaps best articulated in the early case of *Norton v. Shelby County*, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178 (1886), in which the Supreme Court stated:

> An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed. [*Id.*, at 442, 6 S.Ct., at 1125. *See Chicago, I. & L. Ry. v. Hackett*, 228 U.S. 559, 566, 33 S.Ct. 581, 57 L.Ed. 966 (1913).]

The trend has been away from a strict *Norton* approach to an application of the "void ab initio" rule when advisable in order to reach a more equitable or practical result. Thus, in *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940), the Court stated:

> [S]uch broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,—with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified. [*Id.*, at 374, 60 S.Ct., at 318–9. *See Linkletter v. Walker*, 381 U.S. 618, 622–27, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).]

Most recently in *Lemon v. Kurtzman*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973), the Supreme Court addressed the lack of vitality of the strict *Norton* approach:

> However appealing the logic of *Norton* may have been in the abstract, its abandonment reflected our recognition that statutory or even judge-made rules of law are hard facts on which people must rely in making decisions and in shaping their conduct. This fact of legal life underpins our modern decisions recognizing a doctrine of nonretroactivity. Appellants offer no persuasive reason for confining the modern approach to those constitutional cases involving criminal procedure or municipal bonds, and we ourselves perceive none. [*Id.*, at 199, 93 S.Ct., at 1468.]

Many courts have found the logic of the *Norton* Court's inflexible application of the "void ab initio" rule to be unrealistic and have applied tests of reasonableness and good faith to determine the consequences flowing from conduct undertaken pursuant to an invalid act. 1A. Sutherland, Statutes and Statutory Construction § 2.07, at 23 (4th ed. 1972). This appears to be the modern trend. *See Perkins v. Eskridge, supra,* 366 A.2d at 29; *see, e. g., Bookasta v. Hartford Accident & Indem. Co.,* 46 Cal. App.3d 237, 241–42, 120 Cal.Rptr. 229, 231–

---

6.  In answering this question we draw on cases involving judicial declarations of a statute's unconstitutionality, finding the rationale of such cases equally compelling in circumstances where, as here, a court had invalidated a regulation (or statute) as being beyond the authority of the legislative body.

32 (Dist.Ct.App.1975); *Downs v. Jacobs*, 272 A.2d 706, 707–08 (Del.1970); *Reich v. Board of Fire & Police Comm'rs*, 13 Ill.App.3d 1031, 301 N.E.2d 501, 504 (1973); *Stanton v. Lloyd Hammond Produce Farms*, 400 Mich. 135, 253 N.W.2d 114, 118–19 (1977); *Roberson v. Penland*, 260 N.C. 502, 133 S.E.2d 206, 208 (1963); *Box Office Pictures, Inc. v. Board of Finance & Revenue*, 402 Pa. 511, 166 A.2d 656, 660 (1961).

We believe that the reasons articulated by those courts for rejecting the *Norton* approach of rigidly applying the "void ab initio" rule are valid, and therefore follow the recent trend in adopting a test of reasonableness and good faith in determining the effect which the judicial invalidation of a statute or regulation should have on the rights and obligations of parties who have taken action pursuant to an invalid provision.[7] While we recognize that equities are present on both sides in this case, we accept the landlord's argument that it would be unreasonable and unjust to permit the tenant to find relief under the invalid regulation and thereby be excused from her original contractual obligation to pay the agreed-upon rent.

We first look to the contractual relationship between the landlord and the tenant and to the effect of the invalid regulation on that relationship. The landlord and the tenant freely agreed on a rental fee of $285 per month. The intent of the parties subsequently was frustrated because a regulation which neither party foresaw was enacted. That regulation required a rollback of the rent to an amount computed by multiplying the rent for the apartment on February 1, 1973, by 112.32%. The effective 12.32% increase from the February 1, 1973, rent apparently was designed only "to permit rents to catch up with increased costs and to maintain a reasonable return in view of the earlier rent freeze and inflationary conditions." *AOBA I, supra*, 343 A.2d at 330. It acted as a "single, isolated increase with no future flexibility for compensating for uncontrollable operating costs." *Ibid.* This increase from the February 1, 1973, rent thus failed to compensate the landlord for his increasing operating costs. Therefore, at the rolled-back rent of $219.02, the landlord was not receiving the reasonable return from the apartment which Regulation 74–20 was designed to maintain.

Realizing that applications to the Rent Commission for rent increases were not being processed within the required 60 days, the landlord did all that he reasonably could be expected to do to protect his interests. He notified the tenant (1) that a suit had been filed challenging the regulation, and (2) that if the suit were successful the tenant's rent would be readjusted to the pre-rollback level. He awaited the outcome of the suit, and just nine days after this court in *AOBA I* ordered the government to provide a reasonably prompt vindication of the pass-through right and the right to a reasonable return, he submitted an application for a rent increase to the Commission. The tenant agreed to the proposed rental and did not challenge the increase. The increase was granted in full by the Commission because it found that the landlord's return for all of 1973 and 1974, and for the first six months of 1975 on the apartment occupied by the tenant and on another in the same building, considered together, were only .137 percent, .041 percent, and .140 percent, respectively. Thus, during the entire period of appellee's tenancy up to the month before the application for an increase was filed, the landlord was earning considerably less than a reasonable return.

The Commission's finding that a rent of $285 for the apartment was necessary in order for the landlord to achieve a reasonable return provides additional support for his argument that the invalid regulation should not be applied for the purpose of determining the rights of the parties for the period from the date the tenant's rent was lowered to the date it was readjusted to the prior level. To give lasting effect to the regulation for that period would cause

---

7. We do not totally reject the "void ab initio" theory, for some cases may be appropriate for its application. We simply decline to apply it as the general rule in this jurisdiction.

the landlord to suffer the precise injustice which we sought to prevent by our decision in *AOBA I.* We would thereby be forcing the landlord to accept an unreasonable return for his apartment because of his inability to pass through his increased costs under the unworkable system created by the faulty regulation. Such a result would be contrary to our resolution of *AOBA I*, in which he responded to the congressional mandate that landlords be allowed to pass through increased costs to their tenants.

The tenant raises various arguments in support of her position that we should apply Regulation 74–20 in determining the rights of the parties for the period during which her rent was rolled back. She first cites numerous cases to the effect that a rent increase must operate prospectively only. The short answer to this assertion is that in the instant case we are not dealing with a rent increase. Here we are asked to restore the rent to the same level as that provided for in the lease after it had been unlawfully lowered by an invalid regulation. We are not retroactively increasing the rent above a level which previously had been established in a lawful manner.

■ The tenant further argues that our decision to give Regulation 74–20 continued effect for the rolled-back period would play havoc with her budget, since she planned to pay only the rolled-back amount. We reject this argument; she was duly notified by the landlord that Regulation 74–20 was being challenged and that her rent would be readjusted if the suit were successful. Although she quite properly relied on an apparently valid regulation in withholding payments otherwise due the landlord under the lease, when that regulation was declared invalid as it had been implemented prior to the *AOBA I* decision, she could not validly claim that the regulation exonerated her from fulfilling the lease terms upon which she previously had agreed. *See Mor-*

ton v. Godfrey L. Cabot, Inc., 134 W.Va. 55, 63 S.E.2d 861, 866 (1949). Moreover, we conclude that a balancing of the equities favors the landlord on this point. The tenant expressed agreement with the $285 rental figure when she signed the lease. The landlord, therefore, should have been able to rely upon receiving that income in conducting his operations. The rental amount set forth in the lease was no surprise to the tenant. On the other hand, the landlord never agreed to the lower rate of $219.02; rather it was created by legislative fiat. When the landlord later duly requested a rent increase, the tenant agreed to the contractual sum and did not challenge the request.

■ The tenant also claims that the landlord waived his right to sue under the lease for deficiencies in payments by accepting the lower rent from October 1974 through July of 1975. We find this argument to be without merit. It would have been unlawful for the landlord to have refused to roll back his rent to the level required by Regulation 74–20.[8] Acceptance of reduced rental payments under those circumstances cannot constitute a waiver of rights under a valid lease.

The tenant additionally contends that our recognition of a right of the landlord to sue the tenant under the lease for payment deficiencies arising during the ten-month period when she paid only $219.02 rent per month would violate the spirit of this court's decision in *AOBA II. Apartment & Office Building Association v. Moore*, D.C. App., 359 A.2d 140 (1976). More specifically, she asserts that by accepting the landlord's position we are violating the rule recognized in *AOBA II* that: "Increased rents, even under the rent control program, operate prospectively." *Id.*, at 143 (footnote omitted). We find the tenant's contention to be without merit.

---

8. Section 13(a) of Regulation 74–20 provided:

It shall be unlawful, regardless of any agreement, lease or other obligation heretofore or hereafter entered into, for any landlord to demand or receive any rent in excess of the rent ceiling established for any housing accommodation, or to do or omit any act in violation of any provisions of the Act, this regulation, or any rules or orders promulgated and adopted pursuant to the Act and these regulations. [21 D.C.Reg. 289, 302 (Aug. 6, 1974).]

The statements in *AOBA II* to which the tenant directs our attention merely reflect our concern in that case that there be no "surcharge on future rent to make up for past deficiencies." *Ibid.* We refused to order such a surcharge for two reasons. First, "a surcharge would be inequitable, for the burden of make-up payments would then fall upon tenants not in possession for the period of deficiency, or upon tenants then in possession who might have exercised an option to quit." *Ibid.* Second, "a surcharge operates in the nature of a judgment for rent due against persons not parties to the action." *Ibid.* Neither of these problems comes into play from our acceptance of the landlord's position in this case. The burden of paying the deficiency here falls on the tenant who was in possession during the entire period of deficiency. Further, she had an option to quit the premises after the year covered in the lease ended on June 2, 1975. At the end of that year she did not exercise her option to quit, but stayed on for eleven more months, during nine of which she was paying rent at the original lease amount. Thus the only months in which she had an option to quit while she was paying the lower rent were June and July of 1975. No reason is apparent why she would have quit the premises during those two months if the original lease amount of rent had been required, when she chose not to do so for nine months after she resumed payment of the original rent in August of 1975.

The second problem which concerned the court in *AOBA II* also is absent here. A judgment against the tenant for additional rent due would act only as a judgment against a party to an action who had agreed in a formal written lease to pay rent in the total amount sought. In *AOBA II*, we concluded:

> It is unfortunate that petitioners were prevented from passing on past cost increases over which they had no control, but the instant judicial proceedings are not suited to reimburse them for those losses. Whether another meaningful remedy exists for failure of the state to vindicate the pass-through right, we leave to those who possess it. [359 A.2d at 143.]

The landlord possessed the pass-through right which was established by Congress in D.C.Code 1974 Supp., § 45–1622(a). By allowing him to collect the rent to which he was entitled under his valid lease agreement, we recognize the type of remedy alluded to in *AOBA II*.

### III

█ We now turn to the landlord's claim that the trial court erred in requiring him either to return the tenant's sofa to her new residence at his own expense or to compensate her for it. The positions of the landlord and the tenant in this case with regard to the sofa which was left behind when her brother picked up the rest of her belongings are loosely analogous to those of a debtor and creditor. We therefore find the following principles of agency law which are relevant to the debtor-creditor relationship to be of guidance here. The payment of a thing of value by a debtor to other than the authorized creditor cannot change the personal right of that creditor against the debtor. *Taylor v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, D.C. App., 245 A.2d 426, 427 (1968). Thus a debtor who makes a "payment to an agent has the burden of showing that the latter had express or apparent authority to receive such payment on behalf of a creditor." *Ibid.*

█ In this regard we have held that the existence of an agency relationship is a question of fact, and the burden is upon the party relying on an agent's authority to prove it. *Rustler's Steak House v. Environmental Associates, Inc.*, D.C.App., 327 A.2d 536, 539 (1974). A reasonable belief that the agent is authorized does not relieve a person from liability for dealing with an unauthorized agent. Restatement (Second) of Agency § 311 (1958). Therefore, "[a] third party seeking to hold a principal on the apparent authority of the agent must show acts or statements of the principal known to the third party and on which the third party reasonably relied to his detri-

ment." *Tel-Ads, Inc. v. Trans-Lux Playhouse, Inc.*, 232 F.Supp. 198, 201 (D.D.C. 1964).

When the tenant's brother came to her apartment to remove her belongings, he possessed no written authorization from her, and she had not given oral or written notice to the landlord (or his property manager) that her brother would be acting on her behalf. The brother was asked for evidence of his agency, but he could produce none. He also made no effort to telephone the tenant so that she could communicate her wishes to the landlord.

■ In view of the strict burden which the law places on a third party in dealing with an agent to be satisfied as to the agent's authority, we do not believe that the landlord acted unreasonably in refusing to allow the tenant's brother to complete his removal of her belongings from the premises. Had he allowed the brother to remove the belongings, the landlord later would have been saddled with the burden of proving the brother's authority had the brother acted unwarrantedly. In that event the landlord would have been hard put to "show acts or statements of the principal known to [the landlord] and on which [he] reasonably relied" in allowing the belongings to be removed. The landlord was justified in refusing to allow the tenant's brother to continue until he was able to procure a communication from the tenant clarifying her wishes. The trial court thus erred in requiring the landlord to pay the cost of removal of the sofa to the tenant's new residence.

We therefore reverse the trial court's judgment denying the landlord the unpaid rent under the lease and ordering him to pay the cost of transporting the tenant's sofa to her new residence. We remand for entry of judgment in favor of the landlord for $659.80 in unpaid rent and for the cost of transporting the sofa.

*Reversed and remanded.*

YEAGLEY, Associate Judge, Retired, concurring:

I concur in the result. I have no problem with the rejection of the void ab initio rule of *Norton v. Shelby County*, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178 (1886), but I do have some difficulty with the circular reasoning of the majority that brings it back to the same result as *Norton*. To hold retroactively that the Rent Control Regulation under which lower rents were set should not be binding on the parties during the period it was in effect, for the same reason the law was invalidated in *AOBA I*, is the same as invoking the void ab initio rule. Since the decision reaches a result the court refused to reach in either *AOBA I* or *II*, the holding here should be clearly restricted to the equities before us.